UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
THOMAS P. ANDERSON,

                            Plaintiff,

     -against-                              04 Civ 8180(SAS)(DFE)

SOTHEBY'S INC. SEVERANCE PLAN,              This is an ECF case
ADMINISTRATOR OF THE SOTHEBY'S INC.
SEVERANCE PLAN, and                         OPINION AND ORDER
SOTHEBY'S HOLDINGS, INC.,

                            Defendants.
----------------------------------------x


DOUGLAS F. EATON, United States Magistrate Judge.

        This is a discovery dispute about document requests and
proposed non-party depositions pertaining to Plaintiff's claims
that Defendants wrongfully withheld severance benefits.

<u>**FACTUAL AND PROCEDURAL BACKGROUND**</u>

        From 1981 until February 17, 2004, Plaintiff worked for
Sotheby's International Realty, Inc. ("SIR"), which was in the
business of selling luxury real estate.  In 1997, he became an
Executive Vice President of SIR.  He participated in the
Sotheby's Inc. Severance Plan (the "Plan"), which is funded by
Sotheby's Inc.

        On February 17, 2004, SIR was sold by Sotheby's Holdings,
Inc. (hereinafter "Sotheby's") to NRT Incorporated ("NRT"), a
wholly owned subsidiary of Cendant Corporation ("Cendant"), a
non-party to this litigation.  After the purchase, Plaintiff
became an employee of Cendant's Real Estate Franchise Group,
which planned to sell the SIR brand as a franchise to brokerages.
On several occasions in February and March 2004, he met with
Michael Good, the new President of SIR, to discuss Plaintiff's
new responsibilities and new compensation package under Cendant.

        On March 17, 2004, Plaintiff, through counsel, submitted a
claim for benefits under the Plan and a letter stating that he
expected to terminate his employment with Cendant by March 31,
2004.  According to Plaintiff, Cendant "had not offered him a

comparable position (or any defined position at all) with comparable compensation under the terms of the Plan." (Compl. ¶ 41.)  His claim for severance benefits was routed to the Sotheby's, Inc. Severance Plan Committee (the "Committee").

<u>The Pertinent Individuals</u>

_____The Committee was "a group of Sotheby's employees designated by the Administrator to decide eligibility for Plan benefits, including interpreting and construing Plan provisions." (4/19/05 Joint Letter, Defs. at 7.)

The Chair of the Committee was Susan Alexander, who also was Executive Vice-President for Human Resources of Sotheby's. Defendants have not told me who else was on the Committee. [1]  But it is undisputed that all of the Committee meetings held to discuss Plaintiff's claim were attended by Donaldson Pillsbury, Esq. (General Counsel of Sotheby's), Stacey Chervin, Esq. (Associate General Counsel of Sotheby's parent), and Karen Wahle, Esq. of O'Melveny & Myers LLP (outside counsel to the Administrator). (*Id.*, Pl. at 1-2.)

William Sheridan was Chief Financial Officer ("CFO") of Sotheby's.

<u>The Withheld Documents</u>

_____<u>The First Valuation E-Mail.</u>  On March 31, 2004, Ms. Alexander sent an e-mail to Mr. Pillsbury, copying Ms. Chervin and Mr. Sheridan.  She discussed a valuation of the severance benefit demanded by Plaintiff.

_____<u>The Indemnification E-Mail.</u>  A short time later, also on March 31, 2004, Mr. Pillsbury sent an e-mail to Ms. Alexander, Mr. Sheridan, and Ms. Chervin.  He discussed indemnification issues between Sotheby's and Cendant; he also discussed a possible settlement value of Plaintiff's claim.

_____<u>The Second Valuation E-Mail.</u>  On April 13, 2004, Ms. Alexander wrote another e-mail discussing a valuation of the severance benefit.  She sent this e-mail to Mr. Pillsbury and Ms.

_____

[1]     The Complaint (at ¶ 3) names the Committee members as Ms. Alexander, Richard Buckley, Jerry Kasdan, Alean Timm, and George Wachter.  But the Answer denies those allegations.

Chervin.

The Interview Notes.  On July 6 and July 7, 2004, Ms. Alexander and Ms. Wahle interviewed Cendant employees about Plaintiff.  Ms. Wahle took notes and prepared summaries.

On April 12, 2004, Ms. Wahle wrote to Plaintiff, inviting him to submit the factual basis for his claim.  On May 10, 2004, Plaintiff submitted a letter and declaration in support of his claim.  On July 16, 2004, the Committee denied the claim.  On July 20, 2004, Plaintiff appealed and requested certain documents.  On August 20, 2004, Ms. Wahle sent Plaintiff a partial response and wrote that "additional documents" would be forthcoming, "includ[ing] . . . notes of interviews with Cendant employees."  On August 21, 2004, Ms. Wahle sent the Interview Notes to Ms. Chervin and Mr. Pillsbury but not to Plaintiff.  The Committee, acting for the Administrator, denied the appeal on September 20, 2004.

On October 18, 2004, Plaintiff filed the complaint in the case at bar.  He alleges that Defendants "have denied . . . his claimed benefits under the Plan, in violation of the Employment Retirement Security Act, as amended ("ERISA")."  (Compl. at 1.) He also alleges that "Sotheby's has wrongfully withheld compensation earned by [him] between January 1, 2004 and his February 17, 2004 termination."  (Id. at 1-2.)

In March 2005, Defendants produced documents to Plaintiff and served a privilege log stating the reasons why they were withholding certain documents.  Specifically, they withheld the Interview Notes on work product grounds, and withheld the Valuation E-Mails and the Indemnification E-Mail on grounds of work product and attorney-client privilege.

Plaintiff subpoenaed four Cendant employees for deposition and reserves the right to subpoena a fifth.  The five Cendant employees are:

1.    Stuart Siegel.  He was the President and CEO of SIR when it was owned by Sotheby's.  He was Plaintiff's supervisor at SIR.  Mr Siegel is still President at SIR now that it is a sub-subsidiary of Cendant.

2.    Michael Good.  He is the President and CEO of another Cendant subsidiary known as Sotheby's International Realty Affiliates, Inc. ("SIRA").

3

3.   Maria Perez-Brau.  She is the Vice President of Human
     Resources for Cendant's Real Estate Franchise Group.

4.   George Ballantyne.  He was a co-worker of Plaintiff at
     both SIR and Cendant.  Mr. Ballantyne works and lives
     in Massachusetts and is Senior Vice President, Northern
     Region for SIRA.

5.   Richard Meisner, Esq.  He is Cendant's Vice President,
     Corporate-Legal.

(4/27/05 Joint Letter at 8.)

Before the denial of Plaintiff's claim for benefits, Ms.
Wahle and Ms. Alexander interviewed all these individuals except
Mr. Ballantyne.  Ms. Wahle and Ms. Alexander have agreed to be
deposed.  Cendant asks me to preclude depositions of the Cendant
employees.

Pursuant to my Standing Order for Discovery Disputes, I have
received two joint letters.  Regarding the Withheld Documents,
Plaintiff and Defendants sent me a joint letter dated April 19,
2005.  Defendants also submitted the declaration of Ms.
Alexander.  Regarding the depositions, Plaintiff and Cendant sent
me a joint letter dated April 27, 2005.  On May 3, 2005, I issued
an order directing Defendants to submit the two Valuation E-Mails
and the Indemnification E-Mail for my *in camera* review.  I
received them on May 6, 2005.

## THE DISPUTE ABOUT THE WITHHELD DOCUMENTS

Defendants make three arguments for why they should not have
to produce the Withheld Documents: (1) the Withheld Documents
impermissibly exceed the scope of the administrative record; (2)
the Withheld Documents are protected by the work-product
doctrine; and (3) three of the documents are also protected by
the attorney-client privilege.   I will analyze each of these
arguments in turn.

### The Scope of the Administrative Record

Plaintiff claims that, as a court of equity, our Court
should treat the Interview Notes as part of the administrative
record.  Plaintiff does not contend that the Committee reviewed
the Interview Notes.  Rather, Plaintiff states that (a) the

Committee's July 8, 2004 meeting minutes say that Ms. Alexander and Ms. Wahle "relayed the details and contents of the interviews" but (b) the minutes do not describe those "details and contents." (4/19/05 Joint Letter at 3.) Plaintiff also states that "Ms. Wahle promised to produce the Interview notes in August 2004 as part of [the administrative] record. She has offered no explanation for the change of heart." (*Id.*) Defendants have not rebutted these statements. Moreover, if courts were to permit documents such as the Interview Notes to remain outside the administrative record, then plan administrators would have an incentive to direct investigators to report everything to them orally, thus sparing themselves a potentially messy record. Nevertheless, Plaintiff has offered no authority that squarely supports an equitable enlargement of the record to include the Interview Notes, nor have I uncovered such authority. Accordingly, I will now consider whether I should permit discovery of the Interview Notes (as well as the Indemnification E-Mail and the Valuation E-Mails), assuming *arguendo* that all of them fall outside the administrative record.

Before I determine whether Plaintiff is entitled to see the Withheld Documents, I will discuss three threshold questions regarding our Court's role in reviewing the decision of the Committee that acted for the Administrator.

Question 1.  <u>What is the appropriate standard of review?</u>

Depending on the individual case, a district court may review an ERISA administrator's decision with (a) a broad *de novo* review, or (b) a deferential review under the "arbitrary and capricious" standard. "The plan administrator bears the burden of proving that the deferential standard of review applies." *Fay v. Oxford Health Plan,* 287 F.3d 96, 104 (2d Cir. 2002).

An eventual ruling on the standard of judicial review may affect the extent to which a district court may consider documents outside the administrative record. The Second Circuit has held that when undertaking *de novo* review, the decision "to admit additional evidence is one which is discretionary with the district court, but which discretion ought not to be exercised in the absence of <u>good cause</u>." *DeFelice v. American Int'l Life Assurance Co. of New York*, 112 F.3d 61, 66 (2d Cir. 1997) (emphasis added). Yet even when the standard of review is deferential, the Second Circuit has relied on deposition testimony to support its finding that an administrator's decision

was arbitrary and capricious.  *Miller v. United Welfare Fund*, 72
F.3d 1066, 1072 (2d Cir. 1995).  Moreover, in a recent
unpublished decision lacking precedential authority, the Second
Circuit wrote: "Notwithstanding defendant's contention that such
discovery is precluded by our general statement that 'under the
arbitrary and capricious standard [a district court] is limited
to the administrative record,' *Miller v. United Welfare Fund*, 72
F.3d 1066, 1071 (2d Cir. 1995), <u>discovery</u> may be appropriate in
some cases where a petitioner seeks <u>to show a conflict of
interest</u>."  *Wagner v. First Unum Life Ins. Co.*, 100 Fed. Appx.
862, 864 n.1 (2d Cir. June 14, 2004) (emphasis added).  *Wagner*
provides no guidance on how strong a showing a plaintiff must
make to convince a court that it should consider a document
outside the administrative record when it is conducting a
deferential review.  Logically, though, that showing ought to be
greater than the "good cause" showing necessary under *de novo*
review.  For ease of reference, I will label this putatively
greater showing as "good-cause-plus."

    Turning to the case at bar, what is the appropriate standard
of review -- *De novo* review (in which event *DeFelice* requires
"good cause" to go beyond the record)?  Or deferential review (in
which event I would require "good-cause-plus")?  Defendants claim
that our Court should undertake a deferential review, using the
"arbitrary and capricious" standard.  (4/19/05 Joint Letter at
8.)  Based on the record before me, it would be premature for me
to make a finding on the standard of review; this is a decision
more appropriately reserved for Judge Scheindlin, either at trial
or upon a dispositive motion.

    Accordingly, I rephrase the question to read:  With the
standard of review uncertain, how should I approach a request for
discovery outside the administrative record?  I believe the most
sensible approach is for me to rule on Plaintiff's requests under
a requirement of good cause as opposed to good-cause-plus.  My
reasoning is as follows:  If I require good cause-plus and deny
discovery to Plaintiff, and if Judge Scheindlin later rules that
her review will be *de novo*, then Plaintiff might have good
grounds to petition Judge Scheindlin to re-open discovery, citing
*DeFelice* and arguing that I unduly limited discovery.
Conversely, if I require only "good cause" and grant discovery,
and if Judge Scheindlin later rules that her review will be
deferential, then she could simply refuse to consider such
evidence unless she ruled that Plaintiff's showing amounted to
good-cause-plus.  Hence, I will require only "good cause."  This
approach will give Judge Scheindlin more information and easier

options; this will best serve judicial economy.

Question 2.  <u>What could constitute good cause?</u>

The Second Circuit grappled with this issue last year in
*Locher v. Unum Life Ins. Co. of America*, 389 F.3d 288, 296 (2d
Cir. 2004).  Prior to *Locher*, district courts had interpreted
*DeFelice* as holding that a conflicted administrator constituted
*per se* good cause to consider evidence beyond the administrative
record.  The Second Circuit repudiated those earlier cases, and
warned that "a *per se* rule would allow additional evidence to be
presented at the district court level in almost every
circumstance on the basis of a presumed conflict."  *Id.* at 295.
The Second Circuit did not reverse Judge Swain, however, because
she had also found that the insurance company had "no written
procedure for claims review" or "for evaluating and processing
appeals."  *Id* at 296.  According to the Second Circuit, those
factors, in tandem with the conflict of interest, constituted
good cause.  *Id.*  Conflicts of interest and shoddy procedures are
not the only factors that might satisfy the good cause
requirement.  However, *Locher* provides a good guidepost:  A
plaintiff must make a showing that is similar in degree, if not
in kind, to the plaintiff's showing in *Locher*.  On the other
hand, a plaintiff cannot satisfy the good cause requirement
simply by arguing that the plan administrator acted in clear
error.  Otherwise, every ERISA case would include documents
outside the record.

Question 3.  <u>Should a plaintiff have to demonstrate
good cause before he becomes entitled to discovery?  Or
is his burden at the discovery stage somewhat lower?</u>

Cases such as *DeFelice*, *Miller*, and *Locher* arose in the
context of dispositive motions or trials, not discovery disputes.
A discovery ruling was made by Judge Haight in *Sheehan v.
Metropolitan Life Ins. Co.*, 2002 WL 1424592 (S.D.N.Y. June 28,
2002).  After discussing the case law, Judge Haight wrote:

. . . Even if the Court conducts a deferential
review, the existence of a conflict of interest is a
relevant factor for the Court to weigh in determining
whether MetLife abused its discretion.  *Firestone*
[*Rubber and Tire Co. v. Bruch*], 489 U.S. [101], 115
[(1989)]; *DeFelice*, 112 F.3d at 66.  Plaintiff may
therefore seek information tending to show that Bear
Stearns influenced MetLife's decision to terminate

Plaintiff's benefits.  Plaintiff may also seek
information concerning whether MetLife or Bear Stearns
was the payor of benefits granted under the Disability
Plan.

*Id.* at *4 (footnote omitted).  This discovery ruling was later
cited by the Second Circuit with apparent approval.  *Krizek v.
Cigna Group Ins.*, 345 F.3d 91, 98 n.2 (2d Cir. 2003).  After the
close of discovery, the Second Circuit suggested, "[a] more
prudent and judicially efficient approach would be for district
courts to resolve the conflict issue in advance and, only upon
finding 'good cause,' permit the parties to introduce evidence
beyond the administrative record."  *Id.* at n.3.

A very recent discovery order was made by Magistrate Judge
Wall in *Allison v. Unum Life Ins. Co.*, 2005 U.S. Dist. LEXIS 3465
(E.D.N.Y. Feb. 11, 2005).  The opinion is very instructive.  In
*Allison*, the defendant insurance company terminated the
disability benefits of the plaintiff.  After an unsuccessful
administrative appeal, the plaintiff sued in district court,
alleging that the insurance company was conflicted because it had
acted as both the payor of the plaintiff's benefits and as the
claim administrator.  Before getting to the conflict issue, Judge
Wall ruled that plaintiff was entitled to *de novo* review because
the employer had not given any discretion to the claim
administrator First Unum.  *Id.* at *14-*26.  Judge Wall then
proceeded to discuss whether plaintiff was entitled to take
discovery outside the administrative record.  He prefaced his
discussion with the following words:

. . . The court notes that the decision as to
whether to allow discovery is distinct from the
decision as whether to allow consideration of
additional evidence.  If discovery is allowed, the
plaintiff can then apply to the district judge [Judge
Seybert] for a determination as to whether she will
expand the record to include information that discovery
yielded, the nature of which is not yet known.

*Id.* at *34.  Judge Wall went on to rule that:

. . . Allison should be entitled to discovery
about whether First Unum and/or Dr. Schwartz [First
Unum's medical consultant regarding the plaintiff's
benefits] had a conflict when the claim was determined,
and whether that conflict influenced the determination.

As to First Unum, there is little doubt there was a conflict, inasmuch as First Unum was both the payor and the entity that determined entitlement, but the plaintiff may conduct appropriate discovery to determine whether First Unum was in fact influenced by the conflict. As to Dr. Schwartz, it is not clear whether he operated under a conflict of interest or if such conflict affected his decision. Thus, the plaintiff may depose Dr. Schwartz as to those issues and seek relevant documents from him. The plaintiff is also entitled to discovery on issues relating to the procedures used by First Unum in determining her claim, including the identities of the people who made the decision, the criteria used by First Unum in making decisions and determining appeals, and its practice in regard to maintenance of the appeal records, all factors that were significant to the court in *DeFelice* and noted in *Locher*.

The court reiterates that allowing discovery is not tantamount to a ruling that the information gleaned from discovery will be considered by the court in its de novo review. That determination will be made by the district judge at her discretion. The discovery is intended only to give the plaintiff <u>an opportunity to show</u> that good cause exist for going outside the administrative record.

*Id.* at *39-*40 (emphasis added). I agree with Judge Wall's analysis. If a plaintiff were forced to make a full good cause showing just to obtain discovery, then he would be faced with a vicious circle: To obtain discovery, he would need to make a showing that, in many cases, could be satisfied only with the help of discovery.

Accordingly, I rule that Plaintiff need not make the thorough showing of good cause that he must make later before Judge Scheindlin. However, he must show a reasonable chance that the requested discovery will satisfy the good cause requirement. Otherwise, he could indulge in fishing expeditions by summarily stating that any requested discovery might help to show good cause.

Here, Plaintiff lists three grounds, which I will call "Plaintiff's Good Cause Grounds":

In this case, Mr. Anderson contends that the Administrator had a clear conflict of interest. Several facts lead to that conclusion. First, Mr. Anderson's severance claim and his appeal of the denial of that claim were decided by a committee entirely composed of employees of Sotheby's Inc., the entity which would be financially responsible for paying his benefits. Second, the Plan maintains only the barest of procedures, with no specific procedures for the Administrator's consideration of a claim or its consideration of an appeal of the denial of a claim, other than a one-paragraph description in the Summary Plan Description of the timing of notice of determinations. Third, the committee apparently did not keep records of much of the evidence they considered in determining Mr. Anderson's claim and his appeal of the denial of the claim. Stunningly, the Administrator contends that the statements of the Cendant representatives interviewed and relied on by the Administrator are not part of administrative record. The Chair of the Committee, Ms. Alexander, took no notes of those interviews, and the Administrator asserts that Ms. Wahle's notes are protected work product prepared in anticipation of litigation against Mr. Anderson. Furthermore, although Mr. Alexander and Ms. Wahle supposedly reported to the full committee on the content of those interviews, the minutes of the committee's meetings contain no record of what they reported to the committee. *See* July 8, 2004 Minutes (stating only that "Susan [Alexander] and Karen [Wahle] relayed the details and contents of the interviews" but not describing "the details and contents"). The committee's recordkeeping was even more negligent during the appeal process, as <u>no notes exist</u> of comments solicited from the Cendant representatives prior to the determination on review, which apparently were delivered only orally.

(4/19/05 Joint Letter at 3, emphasis in original, stated in more detail in 4/27/05 Joint Letter at 3-5.) I find that these grounds are similar in degree to the good cause factors identified by the Second Circuit in *DeFelice* and *Locher* and applied by the discovery rulings in *Sheehan* and *Allison*.

Defendant argues that Plaintiff has made these allegations "[w]ithout any factual support whatsoever[.]" (4/19/05 Joint Letter at 13.) This objection is not compelling. It is

undisputed that the Committee was composed of employees of the
company that would stand to pay Plaintiff's benefits.  It is also
undisputed that Cendant has refused to indemnify any such benefit
payment.  (Plaintiff was a highly paid executive, and his claim
for severance is well in excess of $1 million.)  With discovery,
there is a reasonable chance that Plaintiff could show that (a)
the Cendant employees shaded their statements for fear that
Cendant might be forced to indemnify, or (b) the Committee was
influenced by a conflict of interest.  It is also undisputed that
Ms. Wahle once agreed to supply the Interview Notes to Plaintiff,
yet they remain outside the record and the denial letter included
only a minimal written summary of the interviews of the Cendant
employees.  With discovery, there is a reasonable chance that
Plaintiff could show that Defendants' procedures for decisions
and appeals were inadequate and did not reasonably assure that
the Committee was receiving accurate information.

     Hence, I find that Plaintiff has made a showing sufficient
to obtain discovery now so that he can use it when he argues to
Judge Scheindlin that she should consider matters beyond the
administrative record.

     Having answered the three threshold questions, I am finally
ready to determine whether Plaintiff may obtain discovery of the
Withheld Documents, even assuming *arguendo* that all of them fall
outside the administrative record.  Each of them could illuminate
at least one of Plaintiff's Good Cause Grounds.  The
Indemnification E-Mail and Valuation E-Mails (and deposition
questions about them) may support Plaintiff's conflict argument
by fleshing out a motive for Defendants to deny Plaintiff
benefits (Cendant refused to indemnify Defendants).  Likewise,
the Interview Notes (and deposition questions about them) may
support Plaintiff's arguments about conflicts of interest and
inadequate procedures.  Accordingly, I find that the Withheld
Documents are relevant to the claims and defenses in the case at
bar.  I will now determine whether the withheld documents are
protected by the work-product doctrine or attorney-client
privilege.

     The Work-Product Doctrine

     Federal Rule of Civil Procedure 26(b)(3) codifies the work-
product doctrine as follows:

          . . . a party may obtain discovery of documents
     and tangible things otherwise discoverable under
     subdivision (b)(1) of this rule and prepared <u>in</u>

<u>anticipation of litigation</u> . . . only upon a showing
that the party seeking discovery has substantial need
of the materials in the preparation of the party's case
and that the party is unable without undue hardship to
obtain the substantial equivalent of the materials by
other means.

(emphasis added).  When a document was prepared for multiple
purposes, *United States v. Adlman*, 134 F.3d 1194 (2d Cir. 1998),
is the seminal Second Circuit case in determining whether the
document was "in anticipation of litigation."  In *Adlman*, a
corporation (through its Vice-President for Taxes) claimed work-
product protection for a memorandum detailing the potential
litigation consequences of a proposed merger.  *Id.* at 1195.  At
the time the memorandum was drafted, no litigation yet existed,
but the corporation viewed litigation as inevitable if it were to
finalize the merger.  This memorandum served both business and
litigation purposes.  The Second Circuit grappled with the proper
test to apply to such dual-purpose documents.  After considering
and rejecting an alternative test, the court adopted the
following formulation:

> The formulation of the work-product rule used by
> the Wright & Miller treatise, and cited by the Third,
> Fourth, Seventh, Eighth, and D.C. Circuits, [where a]
> document[] should be deemed prepared "in anticipation
> of litigation" and thus within the scope of the Rule,
> if "in light of the nature of the document and the
> factual situation in the particular case, the document
> can fairly be said to have been prepared or obtained
> <u>because of</u> the prospect of litigation."

*Id.* at 1202, quoting Charles Alan Wright, Arthur R. Miller and
Richard L. Marcus, 8 Federal Practice and Procedure § 2024 at 343
(1994) (emphasis added by Second Circuit).  Importantly, though,
the Second Circuit continued:

> Conversely it should be emphasized that the
> "because of" formulation that we adopt here <u>withholds
> protection from documents</u> that are prepared in the
> ordinary course of business or that <u>would have been
> created in essentially similar form irrespective of the
> litigation</u>.

*Id.* (emphasis added).

All of the Withheld Documents appear to be documents that Defendants would have created in the ordinary course of assessing an employee's beneficiary's claim for a large severance benefit. They would have investigated the claim by conducting interviews to see whether the claimant's new responsibilities and new compensation were comparable to those at his old job. Also, Defendants would have run some numbers to assess the value of the severance, and they would have negotiated with Cendant about the possibility of indemnification. As Plaintiff points out, if the work-product doctrine protected these documents, "no ERISA plan beneficiary could ever obtain discovery into records of an Administrator's investigations of the claim" because an administrator could almost always claim that it anticipated possible litigation. (4/19/05 Joint Letter at 5-6.)

During my *in camera* review, I noticed that the Indemnification E-Mail also discusses possible settlement numbers. The numbers themselves are "core" work product which must be protected under Rule 26(b)(3) -- an attorney's mental impressions and opinions concerning a potential litigation. Accordingly, Defendants may redact the second sentence of the Indemnification E-Mail. I request defense counsel to place an *ex parte* telephone call to me on May 16 at 10:00 A.M. to discuss whether Defendants should produce some portions of the second sentence (or possibly a paraphrase). However, I will not hold this telephone call if Plaintiff faxes an objection to me by May 13. In all other respects, I deny Defendants' claim of work-product protection for the Withheld Documents.

Attorney-Client Privilege

Defendants argue that the Indemnification E-Mail and the Valuation E-Mails are protected by the attorney-client privilege. Plaintiff counters that the so-called "fiduciary exception" nullifies the attorney-client privilege here. (4/19/05 Joint Letter at 4.) According to the Second Circuit, the fiduciary exception states that:

> . . . an employer acting in the capacity of ERISA fiduciary is disabled from asserting the attorney-client privilege against plan beneficiaries on matters of plan administration.

*In re Long Island Lighting Co.*, 129 F.3d 268, 272 (2d Cir. 1997). The Ninth Circuit discussed that case and explained two rationales for the fiduciary exception:

The fiduciary exception is rooted in two distinct
rationales. . . . First, some courts have held that the
exception derives from an ERISA trustee's duty to
disclose to plan beneficiaries all information
regarding plan administration. *See*, *e.g.*, *Long Is.
Lighting*, 129 F.3d at 271-72. Viewed in this light,
the fiduciary exception can be understood as an
instance of the attorney-client privilege giving way in
the face of a competing legal principle. Other courts
have focused instead on the role of the trustee and
have endorsed the notion that, "as a representative for
the beneficiaries of the trust which he is
administering, the trustee is not the real client in
the sense that he is personally being served." [*United
States v.*] *Evans*, 796 F.2d [264,] 266 [(9th Cir. 1986)]
(quoting *Washington-Baltimore Newspaper Guild, Local 35
v. Washington Star Co.,* 543 F. Supp. 906, 909 (D.D.C.
1982)). Understood in this fashion, the fiduciary
exception is not an "exception" to the attorney-client
privilege at all. Rather, it merely reflects the fact
that, at least as to advice regarding plan
administration, a trustee is not "the real client" and
thus never enjoyed the privilege in the first place.
*See Evans*, 796 F.2d at 266.

*United States v. Mett*, 178 F.3d 1058, 1063 (9th Cir. 1999). The
Second Circuit, however, has stressed:

> Under ERISA, an employer may perform both
> fiduciary and non-fiduciary functions. In line with
> other circuits, we have held that an employer acts as
> an ERISA fiduciary only in plan management or
> administration, not in the plan's design or amendment.

*In re Long Island Lighting,* 129 F.3d at 271. Thus, for the
fiduciary exception to apply here, I must determine whether the
Indemnification E-Mail and Valuation E-Mails pertain to the
"management or administration" of the Plan. Otherwise, the
fiduciary exception will not apply. *See Hudson v. General
Dynamics*, 73 F. Supp. 2d 201, 202 (D. Conn. 1999) (refusing to
apply fiduciary exception to documents concerning amendment of
ERISA plan). Drawing this distinction can be difficult. As

Magistrate Judge Treece noted in *Henry v. Champlain Enters., Inc.*, 212 F.R.D. 73, 86 (N.D.N.Y. 2003) [2]:

> . . . case law provides little guidance as to how to distinguish between fiduciary and non-fiduciary activities.  The discussions therein tend to blur the demarcation between the two even more.  A more reliable yardstick, when considering this exception to the attorney-client privilege, would be to look at the purpose for which the legal advice is sought.

In *Mett*, the Ninth Circuit explained that:

> . . . the case authorities mark out two ends of a spectrum.  On the one hand, where an ERISA trustee seeks an attorney's advice on a matter of plan administration and where the advice clearly does not implicate the trustee in any personal capacity, the trustee cannot invoke the attorney-client privilege against the plan beneficiaries.  On the other hand, where a fiduciary retains counsel in order to defend herself against the plan beneficiaries . . . the attorney-client privilege remains intact.

178 F.3d at 1064.

I have not found any cases within our Circuit that parse the specific issue of whether attorney-client documents pertaining to an administrator's grant or denial of ERISA benefits, created prior to the administrator's decision, fall under the fiduciary exception.  Several cases from other circuits have addressed the issue, however, and provide guidance here.  *See Lewis v. Unum Corp. Severance Plan*, 203 F.R.D. 615, 620 (D. Kan. 2001); *Coffman v. Metropolitan Life Ins. Co.,* 204 F.R.D. 296, 299 (S.D.W. Va.

---

[2] In *Henry,* participants in an employee stock ownership plan ("ESOP") brought an action, including an ERISA claim, against the directors, officers, and shareholders of the employer (who acted as the ESOP's ERISA fiduciaries), for causing the ESOP to purchase over-inflated shares of the employer's stock.  Defendants sought to use the attorney-client privilege to shield documents pertaining to the employer's tax audits.  Judge Treece found these documents "related to the tax audits to be highly relevant to the administration of the ESOP and must be disclosed under 'this fiduciary exception.'" *Id.*

2001); *Geissal v. Moore Med. Corp.,* 192 F.R.D. 620, 625-26 (E.D. Mo. 2000). In *Geissal*, the court held:

> Then plan administrator Herbert Walter states in his affidavit that the plan obtained a legal opinion from attorney Mlynarczyk before the decision to terminate Mr. Geissal's COBRA coverage was finally made, to determine "whether we had a sound legal basis for terminating COBRA coverage . . . ." That legal advice was initially oral and was reduced to writing in a letter dated January 31, 1994. All beneficiaries, including the ultimately disappointed beneficiary, are entitled to know what the legal opinion was, in its oral and written forms. For the purposes of learning this information, Mr. Geissal and the other beneficiaries of the plan were the clients of the retained law firm, not the administrator. Therefore, the attorney-client privilege is inapplicable to bar the production of counsel's communications with the plan administrator upon which this decision of the plan depended.

192 F.R.D. at 625 (citations omitted). *See also Coffman*, 204 F.R.D. at 299 ("[t]here is no indication upon review of these documents that [the attorney] was consulted for the purpose of defending [the administrator in a personal capacity] against any decision made as to Plaintiff's claim."). Even if a defendant were to claim that he created the withheld documents in anticipation of litigation, the fiduciary exception may still apply. As the *Lewis* court persuasively held:

> If the Court finds, as Defendants appear to allege, that the pre-decisional legal advice was secured for the purpose of defending against the disagreement and claims of Plaintiff in prospective post-decisional litigation against the plan, then it follows that whenever the administration of a plan involves the denial of a beneficiary's claim [f]or benefits under a plan, all of the pre-decisional legal advice of counsel would not be subject to the attorney-client privilege and not available for review of the beneficiaries of the plan, including the disappointed beneficiary. This contradicts the principle that the Plan's Administrator administers the Plan in the beneficiaries' best interests. Because denying benefits to a beneficiary is as much a part of the

administration of a plan as conferring benefits to a
beneficiary, the prospect of post-decisional litigation
against the plan is an insufficient basis for
gainsaying the fiduciary exception to the attorney-
client privilege.

203 F.R.D. at 620.

Against this legal background, the Valuation E-Mails clearly
fall under the fiduciary exception. In her declaration, Ms.
Alexander claims that the Valuation E-Mails (as well as the
Indemnification E-Mail):

. . . reflect communications made solely for the
purpose of seeking legal advice concerning the
interpretation of the Stock Purchase Agreement's
provisions regarding employee benefits, the company's
rights under the agreement with respect to Cendant, and
the company's options for enforcing those rights, and
for no other purpose.

(Alexander Decl. ¶ 4.) I have undertaken an *in camera* review of
the Valuation E-Mails and I find Ms. Alexander's description to
be inaccurate. The indemnification issue may have been a
motivation for the drafting of these e-mails, but it cannot be
said fairly that their sole purpose was to seek advice concerning
indemnification. The Valuation E-Mails run some numbers for the
ordinary business purpose of figuring out how many dollars are at
stake. Ms. Alexander sent the First Valuation E-Mail to the CFO.
She sent both e-mails to her in-house lawyers, because she
anticipated that the lawyers would divulge them to Cendant and
(at least in part) to Plaintiff. Such requests fall under the
heading of plan "administration" and are exactly the sort of
documents covered by the fiduciary exception in *Lewis*, *Coffman,*
and *Geissal.*

In the Indemnification E-Mail, Mr. Pillsbury writes about
his brief further discussion with Cendant's in-house HR lawyer.
It appears that Mr. Pillsbury has just provided Cendant with the
dollar valuation set forth by Ms. Alexander in the First
Valuation E-Mail. In the discussion, the two in-house lawyers
agreed to disagree on Sotheby's indemnity claim against Cendant.
Mr. Pillsbury simply reports this to the CFO and Ms. Alexander
and Ms. Chervin. He does not give them any legal advice.
Subsequently, Ms. Alexander chaired the Committee considering
Plaintiff's claim and Mr. Pillsbury and Ms. Chervin attended the

relevant meetings of the Committee. The indemnification issue simply concerns whether Sotheby's or Cendant will pay if Plaintiff is awarded a severance benefit. If we apply the spectrum discussed in *Mett*, the indemnification issue does not concern the personal liability of Mr. Pillsbury or Mr. Sheridan or Ms. Alexander or Ms. Chervin. Thus, I find that the Indemnification E-Mail is unprotected by the attorney-client privilege.

Accordingly, I deny Defendants' claim of attorney-client privilege for the two Valuation E-Mails and the Indemnification E-Mail. However, I repeat that Defendants may redact the second sentence of the Indemnification E-Mail. In all other respects, I direct Defendants to produce the Withheld Documents by May 17, 2005.

## THE DISPUTE ABOUT DEPOSITIONS OF CENDANT EMPLOYEES

Cendant, a non-party, makes three arguments for why it should not have to produce its employees for deposition: (1) the depositions would impermissibly exceed the scope of the administrative record; (2) the depositions would be unduly burdensome; and (3) the depositions would seek confidential business information. I will now analyze Cendant's arguments.

### The Scope of the Administrative Record

As I discussed above, Plaintiff is entitled to undertake discovery that would bolster his effort to establish good cause for Judge Scheindlin to review evidence beyond the administrative record. Depositions of Mr. Siegel, Mr. Good, Ms. Perez-Brau, and Mr. Meisner would fall under the rubric of the Good Cause Grounds. The Chair of the Committee interviewed all four of these witnesses prior to the Committee's decision. The Committee's denial letter relied heavily on its understanding of what those four witnesses had said. (*See* 4/19/05 Joint Letter, Ex. E at 9-12.) True, these four witnesses were not employees of Sotheby's, and three of them had never been. But the crucial question for the Committee was whether Plaintiff's responsibilities were comparable to those at his old job. Accordingly, depositions of these witnesses could explore the breadth and adequacy of the Committee's review process, and also the question of whether any of Cendant's employees shaded their statements for fear that Cendant would be forced to indemnify. Thus, I deny Cendant's request to preclude the depositions of these four witnesses as being outside the administrative record.

Plaintiff also seeks to depose Mr. Ballantyne.  Plaintiff writes:

> . . . Like Mr. Anderson, Mr. Ballantyne was an
> Executive Vice President of SIR in charge of affiliate
> relationships for two regions of SIR.  According to
> documents produced in discovery, Mr. Ballantyne was the
> only other SIR employee eligible for severance benefits
> under the Plan.  Based on Cendant's statements to him
> after the Febraury 17, 2004 sale of SIR, Mr. Ballantyne
> also filed a claim for benefits, asserting that Cendant
> had not offered him comparable responsibilities or
> compensation.  Mr. Anderson expressly asked the
> Administrator to consider that Mr. Ballantyne, who was
> similarly situated, also regarded his duties and
> compensation at Cendant not to be comparable.  The
> Administrator, however, chose not to interview Mr.
> Ballantyne and stated in its determination that it did
> not consider Mr. Ballantyne's situation.  The Court
> [Judge Scheindlin] must assess the reasonableness of
> the Administrator's decision to ignore Cendant's
> treatment of Mr. Anderson's fellow Executive Vice
> President.  Mr. Ballantyne's testimony is also relevant
> to the likelihood that Mr. Anderson would have earned
> the contingent elements of his compensation package, as
> he has first-hand knowledge of the willingness of SIR
> affiliates to convert to franchise.  He can also
> corroborate Mr. Anderson's testimony about
> representations by Cendant officials concerning the
> nature of the duties offered by Cendant to the former
> SIR Executive Vice Presidents.

(4/27/05 Joint Letter at 7-8.)  The topics in the last two sentences
are only marginally relevant, and I am not sure Plaintiff presented
them to the Committee.

The Committee's denial letter set forth reasons why the Committee
had declined to consider Mr. Ballantyne:

> Finally, we address the assertion in your July 20
> letter that the committee failed to consider that
> George Ballantyne, a similarly situated employee, was
> not offered a comparable position by Cendant as of
> March 22, 2004.  Apparently, your argument is that if
> Ballantyne was not offered a comparable position as of
> this date, then neither could Mr. Anderson have been

offered a position.  It is accurate that the committee
did not consider Cendant's history of negotiation with
Mr. Ballantyne –- or any other employee or former
employee –- in its determination of whether Mr.
Anderson is entitled to benefits under the terms of the
Plan, nor do we believe that consideration of other
individual's employment situations would be either
appropriate or relevant.  Ballantyne withdrew his claim
for benefits under the Plan before this committee began
considering it.  Accordingly, the committee undertook
no investigation of the factual assertions in his
attorney's March 22 letter.  Moreover, even if the
author of the March 22 letter was Mr. Anderson's
authorized representative, which he is not, nothing in
the March 22 letter refers to or relates to Mr.
Anderson in any fashion.  Therefore, the committee has
undertaken no research concerning, is not aware of, and
has not considered Ballantyne's employment history in
its determination of Mr. Anderson's claim for Plan
benefits.

(4/19/05 Joint Letter, Ex. E at 12.)

I will ask Defendants to confirm, by May 13, 2005, that
neither Ms. Alexander nor any other attendee at the pertinent
Committee meetings interviewed Mr. Ballantyne about Mr. Anderson
prior to the September 20, 2004 denial.  If they so confirm, then
I preclude Plaintiff from deposing Mr. Ballantyne.  I find that
Plaintiff is receiving enough discovery to make his argument to
Judge Scheindlin that it was unreasonable for the Committee not
to consider Mr. Ballantyne or interview him.

<u>Whether the Depositions Are Unduly Burdensome</u>

In seeking to preclude the depositions, Cendant also argues:

. . . Mr. Anderson has taken no steps to avoid
imposing undue burden on Cendant.  In particular,
Plaintiff has not yet deposed any of the individuals
who made the decision to deny his claim for severance,
yet has sought to take the deposition of third parties
before even ascertaining whether such testimony would
be unnecessarily redundant of testimony he is seeking
from Defendants or evaluating the admissibility of such
third-party testimony.

20

(4/27/05 Joint Letter at 9.)  Plaintiff says that "in principle,
he is agreeable to deposing the party defendant witnesses before
the Cendant employees, but he does not control when Defendants
will make its witnesses available." (*Id.* at 7 n.4.)  I suggest,
but do not require, that Plaintiff depose Ms. Alexander and/or
Ms. Wahle for three hours each, and then depose the Cendant
employees, and then, if necessary, depose Ms. Alexander and Ms.
Wahle again for a grand total of no more than seven hours each.
By May 19, 2005, all depositions should be scheduled with firm
dates.  All fact discovery must be completed by June 21, 2005.

      Alternatively, Cendant requests:

            . . . [A] protective order limiting the scope of
      testimony to (i) information related to the plan
      administrator and (ii) information pre-dating the
      [2/17/04] sale of SIR to NRT Incorporated concerning
      the bonuses Mr. Anderson received while at SIR, the
      method of calculating such bonuses, the net profits of
      the Mid-Atlantic and Tri-State regions for the period
      January 1-February 17, 2004, the net profits of the
      Greenwich Office for the period January 1-February 17,
      2004 as compared to its profits for the same period in
      2003, and sales closed in the mid-Atlantic and Tri-
      State regions from January 1-February 17, 2004, subject
      to a stipulation of confidentiality that is mutually
      acceptable to Cendant and Mr. Anderson.

(*Id.* at 9.)

      I reject the suggestion that the pertinent cut-off date is
February 17, 2004.  For the next several weeks, Plaintiff worked
for a Cendant subsidiary.  His compensation was directly linked
to the number of affiliates that could be converted to franchises
in 2004.  He is entitled to discovery on that topic, and on
Cendant's views as to whether it might be required to indemnify
(to the extent such views were expressed to Sotheby's or to any
of the four witnesses prior to September 20, 2004).  He is
entitled to explore any communications between Cendant and
Sotheby's concerning him prior to September 20, 2004.  He is also
entitled to explore whether any of those communications was
inaccurate.  He is also entitled to explore the bases and
motivations for Cendant's job offer to him.

      Finally, Cendant requests "that such information be
protected pursuant to a stipulation and order of confidentiality

Hon. Shira A. Scheindlin

that is mutually acceptable to Mr. Anderson and Cendant."
(4/27/05 Joint Letter at 14.)    Cendant specifically notes:

> . . . [it] has concerns that at least some of the
> confidential information that Mr. Anderson is seeking
> is not being sought in connection with his claim for
> severance or his claim for a pro rata bonus at all.  It
> has these concerns because the business plaintiff has
> an interest in (Washington Fine Properties) is
> currently negotiating a potential purchase of two
> franchise locations from SIRA, and because Mr. Anderson
> is personally negotiating this potential deal.

(*Id.* at 13-14.)  Plaintiff responds:

> Mr. Anderson does not seek confidential business
> information from Cendant except to the extent that
> information relates to (1) the calculation of his 2004
> bonus from SIR, or (2) the number of affiliates that
> converted to franchises, as his compensation was
> directly linked to the number of such conversions.
> Contrary to Cendant's assertion, Mr. Anderson is not
> "negotiating a potential purchase of two franchise
> locations from SIRA" on behalf of his company,
> Washington Fine Properties ("WFP").  WFP has been in
> negotiations with former SIR affiliates, but has had no
> such dealings with SIRA franchises.

(*Id.* at 8 n.5.)  As soon as possible, Cendant should draft a
proposed stipulated protective order to protect any confidential
business information that may arise during the depositions of the
Cendant witnesses.  I direct Plaintiff to serve his comments on
that proposal within three business days from receipt.  If there
is no agreement, I will rule on the basis of a new joint letter.

In all other respects, any further discovery disputes should
be addressed to Judge Scheindlin.

DOUGLAS F. EATON
United States Magistrate Judge
500 Pearl Street, Room 1360
New York, New York 10007
Telephone: (212) 805-6175
Fax: (212) 805-6181

22