UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6-21-06

-----------------------------------------------------------------X

THOMAS P. ANDERSON,

         **Plaintiff,**

   - against -

SOTHEBY'S, INC., SEVERANCE PLAN,
ADMINISTRATOR OF THE SOTHEBY'S,
INC. SEVERANCE PLAN, and SOTHEBY'S
HOLDINGS, INC.,

         **Defendants.**

-----------------------------------------------------------------X

**OPINION AND ORDER**

**04 Civ. 8180 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

Thomas B. Anderson moves for summary judgment on his claims against the Sotheby's, Inc. Severance Plan (the "Plan"), the Administrator of the Plan (the "Administrator"), and Sotheby's Holdings, Inc. ("Sotheby's"). Anderson seeks severance benefits under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and payment of an unpaid bonus earned during the period January 1 through February 17, 2004. Defendants cross-move for summary judgment and ask that plaintiff's motion be denied. For the following reasons, both motions are granted in part and denied in part.

# I.    INTRODUCTION

Sotheby's International Realty, Inc. ("SIR") was a subsidiary of Sotheby's until February 17, 2004, when it was purchased by NRT Incorporated, a subsidiary of Cendant Corporation ("Cendant"), through a stock purchase agreement.[1] At the time of the sale, Anderson had been employed by SIR for over twenty years and was an Executive Vice President and Regional Manager of SIR's Mid-Atlantic and Tri-State regions.[2] At SIR, Anderson represented sellers and buyers in the sales of luxury residential properties, negotiated such sales, and promoted SIR's exclusive marketing services to owners of luxury properties within his regions. As a result of the SIR stock sale, Anderson's employment was terminated on February 17, 2004.[3] Following his termination, Anderson was advised by Cendant that he would be employed in Cendant's Real Estate Franchise

---

[1]    *See* Plaintiff's Local Rule 56.1 Statement of Undisputed Facts ("Pl. 56.1") ¶ 7.

[2]    *See id.* ¶¶ 1, 9.

[3]    *See id.* ¶ 8. Anderson has also brought a claim for the unpaid bonus earned at SIR for the period January 1, 2004, through his termination on February 17, 2004. The unpaid bonus claim is brought under breach of contract and quantum meruit theories.

Group.[4]   Anderson resigned from Cendant on March 31, 2004.[5]

In a letter dated March 17, 2004 Anderson made a claim for severance benefits under the Plan.[6]  The Plan is administered by the Sotheby's, Inc. Severance Committee (the "Committee"), which is made up of Sotheby's employees designated by Sotheby's Board of Directors to decide any and all questions regarding Plan benefits.[7]  Anderson claimed that he was entitled to severance benefits because Cendant had not offered him a comparable position with regard to responsibilities and compensation.[8]  The Committee acknowledged receipt of Anderson's claim in a letter dated April 12, 2004.[9]  The Committee's

---

[4]   *See id.* ¶ 10.

[5]   *See id.* ¶ 18.

[6]   *See id.* ¶ 12. Sotheby's, Inc., the Plan's Administrator, funds the Plan, which is otherwise unfunded. Sotheby's Inc. pays Plan benefits solely out of its general assets. *See* Administrative Record ("AR"), Ex. A to the Declaration of Julia Judish in Support of Plaintiff's Motion for Summary Judgment ("Judish Decl."), at A0013- A0014. Susan Alexander, Sotheby's Executive Vice-President for Human Resources, was the Chair of the Committee while Karen Wahle of O'Melveny & Myers LLP was outside counsel to the Administrator. *See Anderson v. Sotheby's Inc. Severance Plan*, No. 04 Civ. 8180, 2005 WL 2583715, at *1 (S.D.N.Y. Oct. 11, 2005).

[7]   *See* Defendants' Local Rule 56.1 Statement of Undisputed Material Facts ("Def. 56.1") ¶ 6.

[8]   *See id.* ¶ 10.

[9]   *See id.* ¶ 11.

3

letter invited Anderson to set forth the facts and reasoning supporting his claim and explained that it would decide his claim in accordance with the Plan's claim procedures.[10] Anderson responded to this invitation by submitting a detailed letter from counsel as well as his own 46-paragraph declaration setting forth his position regarding the comparability of his positions at SIR and Cendant.[11]

On July 16, 2004, the Committee provided Anderson with a written denial of his claim.[12] In an eleven-page, single-spaced letter, the Committee concluded that Anderson "had no change in his job responsibilities prior to his resignation on March 31, 2004, and was offered an ongoing position by Cendant that was of comparable responsibilities and compensation to that which he performed for SIR prior to the February 17, 2004 sale of SIR to Cendant."[13] In a letter dated July 20, 2004, Anderson requested that the Committee reconsider its decision denying him benefits.[14] On September 20, 2004, the Committee denied

---

[10] *See id.*

[11] *See id.* ¶ 12.

[12] *See id.* ¶ 33.

[13] 7/16/04 Letter from Susan Alexander to Anderson, AR at A0169.

[14] *See* Def. 56.1 ¶ 39.

4

Anderson's request for reconsideration.[15]

## II.   BACKGROUND

### A.   The Plan

The Plan provides salary continuation for eligible employees in the event that employment is terminated by the Company.[16]   A Plan participant is entitled to severance benefits if employment is terminated and the following condition is satisfied:

> The Employee is involuntarily terminated from the Company because of (i) the sale or elimination of a business entity, business unit or department; or (ii) a consolidation of business units or departments. . . . [A]n employee shall not be entitled to receive Severance Benefits under the Plan if the buyer of the business entity, unit or department continues to employ Employee and Employee's job responsibilities and compensation are comparable to his job responsibilities and compensation with the Company prior to the sale or elimination of the business entity, unit or department.   Such determination will be made by the Company in its reasonable discretion.[17]

---

[15]   *See id.* ¶ 45.

[16]   *See* Sotheby's, Inc. Severance Plan, Art. 1, AR at A0002. The "Company" includes Sotheby's, Inc., Sotheby's Holdings, Inc., any domestic subsidiary of Sotheby's Holdings, Inc., and any successors thereto. *See id.*, Definitions ¶ (d), AR at A0002.

[17]   *Id.* ¶ 4.1(a), AR at A0004.

The Plan further states that the refusal to accept an equivalent position within the

Company disqualifies an employee from receiving severance benefits.[18] The Plan

defines "equivalent position" as "one in which the Employee's job responsibilities

and compensation are comparable to his job responsibilities and compensation

prior to the sale or elimination of the business entity, unit or department or

consolidation of business units or departments."[19]

The Plan also includes a claim review procedure by which

participants may seek severance benefits. The procedure is described in the

Summary Plan Description as follows:

> If you or your beneficiary feel that you are not receiving a
> Plan benefit that you should, you may file a written claim
> for the benefit with the committee administering the Plan,
> or in the absence of a committee, the Company. If the
> committee denies your claim, you will receive written
> notice within 90 days of the date your claim was filed,
> telling you why it was denied, and on what part of the Plan
> the denial is based. The notice will also tell you what, if
> anything, you can do to have your claim approved. You
> will have a chance, within 60 days after you get this written
> notice, to ask for a final review of your claim and its denial
> by the committee. You and your representative can review
> the documents that relate to your claim and can make
> written comments to the committee. Your claim will then
> be reviewed again by the committee and you will get a

---

[18] *See id.* ¶ 4.2, AR at A0004.

[19] *Id.* ¶ 4.2(d), AR at A0005.

6

written notice of the final decision within 60 days after
your request for a review.[20]

The Summary Plan Description repeats that severance is not available when an

employee refuses to accept an equivalent position within the Company and defines

"equivalent position" as "one which is determined by the Company, in its

discretion, to be similar to the position you held prior to your termination. This

determination will consider factors such as position responsibilities, level of

authority, compensation, benefits and any other relevant considerations."[21]  When

benefits are denied, the Summary Plan Description states that the claimant and his

representative "can review the documents that relate to [the] claim and can make

written comments to the committee."[22]

**B.     The Evidence of Record**

**1.     Anderson's Declaration**

Anderson submitted a declaration dated May 6, 2004 in support of his

claim.[23]  The Anderson Declaration begins with the following description of

---

[20]   Summary Plan Description, Claims Procedure, AR at A0014.

[21]   *Id.*, Eligibility for Benefits, AR at A0012.

[22]   *Id.*, Claims Procedure, AR at A0014.

[23]   *See* Declaration of Thomas Anderson ("Anderson Decl."), AR at A0045-
A0099.

Anderson's responsibilities at SIR:

> My responsibilities as Executive Vice President at SIR
> were primarily: (i) to establish and sell SIR's luxury real
> estate services in my regions; (ii) to establish and manage
> the exclusivity of SIR's services, in only the finest luxury
> markets, to only the appropriate eligible luxury properties;
> (iii) to maximize profit for SIR through the sale of luxury
> properties through SIR's affiliates and Greenwich
> brokerage and to meet and exceed the annual financial plan
> for my regions, as approved by the Sotheby's Board of
> Directors. I carried out these responsibilities through three
> principal duties: (i) managing and directing SIR's
> successful relationships with its twenty-three affiliates in
> the New York Tri-State and Mid-Atlantic regions; (ii)
> working closely with these affiliates in promoting
> Sotheby's marketing services, for an additional fee per
> property, to potential sellers of high-end residences; and
> (iii) personally performing realtor services for buyers and
> sellers of the highest priced residences in my affiliates'
> markets and on behalf of SIR's Greenwich brokerage
> within my regions.[24]

Anderson then describes the sale of SIR and his position following

the sale. On the day of the sale, he received an e-mail announcement informing

him that Cendant had acquired "'a long-term license to develop a franchise

network of leading luxury real estate brokerages under the Sotheby's International

Realty brand."[25] The e-mail stated that Stuart Siegel, former President and Chief

---

[24] *Id.*, AR at A0045-A0046.

[25] *Id.*, AR at A0050.

8

Executive Officer of SIR, would become a Senior Vice President at NRT Incorporated.[26] The e-mail also introduced Michael Good as the new President and Chief Executive Officer of Sotheby's International Realty Corporation.[27] After the sale, Anderson was transferred to Cendant's "franchise division" where he reported to Good.[28] The division in which Anderson was placed was named the SIR Real Estate Franchise Group.[29]

On February 18, 2004, Anderson met Good for the first time.[30] The next day, Anderson and three other regional managers met with Good and were told that they would be charged with selling the SIR franchise to real estate brokerages and were to begin with selling franchises to existing SIR affiliates and then to additional broker franchises in new markets.[31] Anderson was not told whether and to what extent he would service his affiliates after selling them the

---

[26]  *See id.*

[27]  *See id.*

[28]  *Id.*

[29]  *See id.*  According to Anderson, the Real Estate Franchise Group did not engage in listing and home sales activities.  All of the brokerage activities had been moved to NRT, from which Anderson and the other regional managers had been transferred.  *See id.*, AR at A0054.

[30]  *See id.*, AR at A0050.

[31]  *See id.*, AR at A0050-A0051.

SIR franchise.[32] It became apparent to Anderson that he was no longer in the business of selling luxury residences but instead had become a franchise salesman.[33] Around this time, Siegel allegedly told Anderson that his role going forward in the franchise operation would be "dramatically different" than the role he played at SIR in the past.[34] Siegel also allegedly told Anderson that he could understand why Anderson would not want to make that change.[35] On February 26, 2004, Anderson met with Good again and informed him that he did not want to be a "franchise salesman."[36] Good allegedly told Anderson that his job as it "exists is converting to franchise sales" and that "the role of the manager under the Cendant franchise model would be a change for [Anderson]."[37]

　　　　Anderson also raised the issue of compensation with Good and informed him that he had been earning in excess of $800,000 for the past several

---

[32]　*See id.*, AR at A0051.

[33]　*See id.*

[34]　*Id.*

[35]　*See id.*

[36]　*Id.*, AR at A0051-A0052. Anderson complained that selling franchise agreements to brokerages is an entirely different activity than selling luxury homes to affluent individuals. *See id.*, AR at A0052.

[37]　*Id.*, AR at A0052.

10

years, to which Good allegedly responded "that will no longer be possible."[38]  At

another meeting held on March 16, 2004, Good did not provide any further details

regarding the responsibilities of Anderson's position but instead presented him

with a written plan of compensation for 2004 through 2008 (the "Compensation

Proposal").[39]  Good informed Anderson that the most Senior Vice Presidents

earned was "in the high $400,000s at best."[40]  From 1999 through his termination,

Anderson's annual compensation included: (1) a base salary of $150,000; (2) a

percentage-based incentive bonus in the amount of 36.3% of the pre-tax profits of

the Tri-State and Mid-Atlantic regions adjusted to add-back Anderson's base

salary, less Anderson's base salary; and (3) 5% of the adjusted pre-tax profits of

the Greenwich brokerage exceeding the adjusted pre-tax profits for the preceding

year.[41]  In 2001, Anderson's incentive bonus was  $772,458.78;[42] in 2002 the

---

[38]  *Id.*

[39]  *See id.*, AR at A0053.

[40]  *Id.*, AR at A0052.  Senior Vice President was the highest Cendant title given
to former SIR regional managers.  *See id.*

[41]  *See id.*, AR at A0048.

[42]  *See id.*, AR at A0084.  The amount of the 2001 bonus was communicated to
Anderson in a letter dated March 6, 2002.

bonus was $656,906.07;[43] and in 2003 it was $656,007.94.[44]  When combined with his base salary, his car and parking allowances, and his stock option plan, Anderson's compensation for 2001 exceeded $935,000, and in 2002 and 2003 his total compensation exceeded $815,000.[45]

Under the Cendant Compensation Proposal, Anderson's compensation would have been calculated as follows:

|  | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
|  |  | | (In Thousands) | | |
| Base Salary | $300 | $300 | $300 | $300 | $300 |
| Bonus | 150 | 150 | 120 | 120 | 120 |
| LTIP | — | 50 | 100 | 150 | 200 |
| Sales Incentive | 35 | 15 | — | — | — |
| Sales Incentive (50%) | 75 | — | — | — | — |
| Sales Incentive (70%) | 100 | — | — | — | — |
| Sales Incentive (85%) | — | 200 | — | — | — |
| Sales Annuity | — | — | 200 | 200 | — |
| Discretionary Bonus | 100 | 100 | — | — | — |
| Lump Sum Retention | — | 800 | — | — | — |
|  | ===== | ===== | ===== | ===== | ==== |
| Total Compensation | $760 | $1,615 | $720 | $770 | $620 |
|  | ===== | ===== | ===== | ===== | ==== |
| Severance w/ Non-Compete |  | $800 |  |  |  |
|  |  | ===== |  |  |  |

---

[43]  *See id.*, AR at A0086.  The amount of the 2002 bonus was communicated to Anderson in a letter dated January 23, 2003.

[44]  *See id.,* AR at A0088.  The amount of the 2003 bonus was communicated to Anderson in a letter dated February 9, 2004.

[45]  *See id.*, AR at A0049.

The "Bonus" line reflects a guaranteed bonus of $150,000 for 2004 and 2005, which decreases to $120,000 in 2006-2008.[46] According to Anderson, the Base Salary and Bonus were the only guaranteed portions of the Compensation Proposal.[47] The "LTIP" line stands for long-term incentive plan.[48] While Good described this component as "restricted stock unit awards," it is unclear whether it was guaranteed, discretionary, or linked to the performance of any duties.[49] Moreover, the basis for valuing the restricted stock was not stated.[50] The "Sales Incentive" line, which was $35,000 in 2004, was intended to further compensate Anderson for converting current eligible affiliates into franchises.[51] In 2004, Anderson could have also earned an additional $75,000 Sales Incentive if fifty percent of the affiliates in his regions converted to franchises and an additional

---

[46] *See id.*, AR at A0053.

[47] *See id.*

[48] *See id.*, AR at A0054.

[49] *Id.* The Committee acknowledged that Anderson's annual award under the Long Term Incentive Plan would increase by $50,000 per year "as long as the grants continued," thereby implying a discretionary element to this bonus. AR at A0165.

[50] *See id.*

[51] *See id.*, AR at A0053. However, Anderson claims that Good told him that the Sales Incentive component would actually be calculated as a set amount per converted affiliate and provided $3,000 per affiliate as an example.

$100,000 if seventy percent of his affiliates converted.[52] The "Sales Annuity"
component, scheduled for 2006 and 2007, is based on estimated gross royalties
received by Cendant from converted franchisees.[53] The "Discretionary Bonus"
line of $100,000 for 2004 and 2005 was "based on [Anderson's] personal sales of
luxury homes,"[54] but there was no explanation of who would exercise the
discretion or on what basis the bonus would be calculated.[55] The "Lump Sum
Retention" of $800,000 was a non-discretionary bonus to be paid if Anderson was
still employed by Cendant on December 31, 2005.[56] The 2005 column also
reflects an additional $800,000 severance payment, effective January 1, 2006,
conditioned on Anderson signing a non-competition agreement.[57] This stipulated
severance payment was useless to Anderson who was unwilling to sign a non-
competition agreement.[58] Presumably, if Anderson were to have qualified for the

---

[52] *See id.*

[53] *See id.*, AR at A0055.

[54] *Id.*, AR at A0054. After 2005, "nothing in the compensation proposal
contemplated any personal involvement by [Anderson] in sales of luxury homes."
*Id.*

[55] *See id.*

[56] *See id.*

[57] *See id.*

[58] *See id.*

$800,000 severance payment, he would not have qualified for the $800,000 retention bonus.

### 2.    March 17, 2004 Letter

Anderson first requested severance benefits in a letter dated March 17, 2004 sent to both Sotheby's and Sotheby's, Inc.[59]  In that letter, Anderson describes his employment with SIR, first stating that he managed and directed SIR's relationships with its twenty-three affiliates in the Tri-State and Mid-Atlantic regions.[60]  He then states that he "worked closely with these affiliates in promoting Sotheby's marketing services, for an additional fee per property, to potential sellers of high-end residences."[61]  Anderson also personally performed realtor services for buyers and sellers of high-priced luxury residences within his affiliates' markets.[62]  In sum, the majority of Anderson's recent professional efforts were devoted to "representation of sellers and potential buyers and to the negotiation and sales of high priced homes."[63]

---

[59]  *See* 3/17/04 Letter From Christine N. Kearns, plaintiff's counsel, to William Ruprecht, President and Chief Executive Officer of Sotheby's, AR at A0021-A0025.

[60]  *See id.*, AR at A0021.

[61]  *Id.*, AR at A0021-A0022.

[62]  *See id.*, AR at A0022.

[63]  *Id.*

Anderson then describes his position after the Cendant purchase.

Anderson learned that Cendant planned to convert SIR's current affiliates into franchises, as it had done with Coldwell Banker, Century 21 and ERA.[64] According to Anderson, Stuart Siegel, former President of SIR, acknowledged that Anderson's "role going forward in the franchise operations would be dramatically different than the role he had played at SIR in the past. . . ."[65] Then, on February 19, 2004, Michael Good, President and CEO of Sotheby's International Realty Affiliates, Inc., confirmed that Anderson's role would be in franchise operations, but he did not offer any details other than that Anderson's new job responsibility would be to sell the Sotheby's franchise to SIR's former affiliates.[66] At a second meeting on February 26, 2004, Good admitted that Anderson would be unable to earn the same level of compensation he had been earning at SIR.[67] On March 16, 2004, Anderson had his third meeting with Good, at which time he was presented with a "Compensation Plan" that set forth the components of his proposed compensation over a five-year period.[68] "There was no statement of what his

[64] *See id.*

[65] *Id.*

[66] *See id.*

[67] *See id.*

[68] *See id.*, AR at A0023.

16

duties, responsibilities or authority would be in 2004, although the bulk of his

compensation package was clearly linked to successful franchise conversions."[69]

### 3. March 29, 2004 Letter

David J. Weaving, Senior Vice-President of Cendant's Real Estate

Services Division, wrote to William S. Sheridan, Sotheby's Chief Financial

Officer, on March 29, 2004.[70] That letter states that "Cendant and NRT are willing

to cooperate with Sotheby's Holdings, Inc. ("Sotheby's") and Mr. Anderson to

assure that he is offered duties and compensation opportunities equivalent and/or

comparable to those previously provided to him by Sotheby's."[71] The letter

further states: "Mr. Anderson's current duties and responsibilities *are under*

*negotiation* and *may change* in some respects to accommodate the Cendant/NRT

franchise model in the future. . . ."[72] The letter concludes as follows:

> Cendant will continue to develop new proposals which
> seek to meet Mr. Anderson's concerns. In any event, in
> light of Mr. Anderson's dissatisfaction and appeal for
> severance, for the time being, NRT is willing to maintain

[69] *Id.*

[70] *See* 3/29/04 Letter From David J. Weaving, Senior Vice-President and Chief Financial Officer of Cendant's Real Estate Services Division, to William S. Sheridan, Chief Financial Officer at Sotheby's, AR at A0032-A0034.

[71] *Id.,* AR at A0032.

[72] *Id.* (emphasis added).

17

Mr. Anderson's previous role and compensation package in all material respects so that the parties can negotiate a satisfactory arrangement.

NRT will continue to negotiate appropriate modifications to Mr. Anderson's position and compensation. In the interim, as mentioned above, NRT will maintain Mr. Anderson's prior position and compensation opportunities until the parties negotiate a mutually acceptable arrangement.[73]

### 4.    May 10, 2004 Letter

In response to a letter from Wahle inviting Anderson to fully set forth the facts in support of his claim, Anderson submitted a detailed letter to the Committee on May 10, 2004.[74] That letter contains the following side-by-side comparisons of Anderson's responsibilities and authority before and after the sale of SIR:[75]

| Responsibilities Before Sale | Responsibilities After Sale |
| --- | --- |
| Establishing and selling SIR's luxury real estate services | Selling SIR's franchise to affiliate brokerages |
| Establishing and managing the exclusivity of SIR's services, in only the finest luxury markets, to only the appropriate eligible luxury properties. | No exclusive luxury program to manage and no significant services to provide. SIR's brand to be used by all properties listed with franchisees. No marketing of exclusive services to |

---

[73] *Id.*, AR at A0034.

[74] *See* 5/10/04 Letter From Kearns to Wahle, AR at A0100-A0108.

[75] *See id.*, AR at A0102-A0103.

Selling SIR's luxury services for an additional fee to sellers of luxury residences.

home-sellers for an added fee.

Maximizing profit and creating income for SIR through the sale of luxury properties through SIR's affiliates and Greenwich brokerage and personal involvement in the listing of and sales process of an annual inventory of approximately 200 luxury properties.

No role nor ability to influence sales of SIR-listed properties. The franchise model is for all properties – an inventory of thousands. Unable to influence performance of affiliates or to affect SIR profits once affiliates are converted.

| Authority Before Sale | Authority After Sale |
| --- | --- |
| Complete authority to select what markets would have an SIR affiliation in his regions. | No authority. All decisions made by Cendant. |
| Complete authority to select what brokerages would be offered the SIR affiliation in his region. | No authority. All decisions made by a Cendant Board. |
| Complete authority to determine which properties would be eligible for SIR services. | No authority. All properties listed by franchisee would have SIR services. |
| Complete authority to establish affiliate contract terms. | No authority. Franchise model and contracts set by Cendant. |

The letter then asserts that Cendant did not offer Anderson a position with comparable responsibilities, authority, compensation, or benefits and that

such a position did not exist at Cendant.[76]  Anderson's letter argues that these

assertions are bolstered by the March 29, 2004 letter from Weaving to Sheridan

because

> Cendant's Mr. Weaving makes certain key admissions that
> support the claim.  For example, Mr. Weaving states that
> Mr. Anderson's "current duties and responsibilities are
> under negotiation;" the duties were expected to change "to
> accommodate the Cendant/NRT franchise model in the
> future;" and Cendant had not met "Mr. Anderson's
> concerns."    Moreover, Mr. Weaving's offer to Mr.
> Sheridan – made well after Mr. Anderson sought severance
> benefits from Sotheby's – that Cendant was "willing to
> cooperate with [Sotheby's] . . . to assure [that Mr.
> Anderson] is offered duties and compensation
> opportunities equivalent and/or comparable to those
> previously provided to him by Sotheby's" concedes that
> Mr. Anderson did not hold a position with equivalent
> duties and compensation opportunities at that time.  Mr.
> Weaving did not, because he could not, identify or describe
> what such a comparable position could possibly be.[77]

The letter ends with a statement that Anderson was not given any job description

at all, much less one that provided him with a comparable position.  In conclusion,

the letter states that "Anderson was employed by a real estate franchise division

which did not even engage in the activities for which he was principally

---

[76]  *See id.*, AR at A0104.

[77]  *Id.*, AR at A0104.

20

responsible at SIR and for which he was highly regarded in the industry."[78]

### 5.    May 28, 2004 Letter

In a letter dated May 28, 2004 Cendant denied any liability for any severance obligations owed by Sotheby's to Anderson.[79]  The letter also stated that a written offer of employment is attached which "speaks for itself."[80]  Despite the absence of a written offer of employment, the letter also stated that "Cendant's offer of employment appropriately set[s] forth a description of Mr. Anderson's job responsibilities.  Although not identical, the respective job responsibilities provided to Mr. Anderson are certainly suitable for comparison."[81]  The latter statement is suspect, however, given Cendant's admission that it is "not in a position to address Mr. Anderson's description of his responsibilities and authority prior to the sale . . . ."[82]  The letter ended with the following statement: "We deny that Mr. Anderson would have simply been a 'franchise salesman,' and in any

---

[78]   *Id.*, AR at A0107.

[79]   *See* 5/28/04 Letter From C. Patterson Cardwell, Senior Vice-President of Cendant Legal, to Don Pillsbury of Sotheby's, AR at A0110-A0112.

[80]   *See id.*, AR at A0110.  As it turns out, there never was a written offer of employment.  *See* Pl. 56.1 ¶ 31.

[81]   *Id.*, AR at A0111.

[82]   *Id.*  Cendant does, however, disagree with Anderson's claim of having "complete authority" as this suggests that Anderson had no supervising officer whatsoever.

event we deny that the role of franchise salesman would not be a comparable position for Mr. Anderson."[83]

### 6. June 9, 2004 Letter

In its June 9, 2004 letter, Cendant admitted that it did not provide Anderson with a written offer letter.[84] Cendant stated that "Anderson was provided with a verbal offer of employment with terms and conditions comparable to his position prior to Cendant's acquisition, many of which terms and conditions Mr. Anderson described in his claim for benefits, and accordingly Cendant confirms its prior position that it made Mr. Anderson a 'comparable offer of employment' . . . ."[85] This letter attached the Compensation Proposal previously provided by Good.[86] As to compensation, the letter explained that the "overall design of the compensation plan was intended to provide aggregate compensation opportunity, while at the same time aligning Mr. Anderson's interests with those of Cendant's shareholders."[87]

---

[83]  *Id.*, AR at A0112.

[84]  *See* 6/9/04 Letter From Cardwell to Pillsbury, AR at A0121.

[85]  *Id.*

[86]  *See id.*, AR at A0122.

[87]  *Id.*, AR at A0121.

### 7. June 28, 2004 Letter

The June 28, 2004 letter from Anderson's attorney to defendants' attorney cites *Dabertin v. HCF Manor Care, Inc.*,[88] as a case with a fact pattern "strikingly similar" to Anderson's.[89] According to Anderson, *Dabertin* supports his claim for benefits even under the more deferential arbitrary and capricious standard of review of an employer's decision to deny benefits.[90]

### 8. June 29, 2004 Letter

In a letter dated June 29, 2004 Anderson's attorney provided the Committee with a transcribed version of Anderson's handwritten notes found at the bottom of Exhibit G to his Declaration (the Compensation Proposal).[91] Anderson's notes relate to, and supplement, the information contained in footnotes (b) through (g) of the Compensation Proposal.[92]

---

[88] 373 F.3d 822 (7th Cir. 2004).

[89] *See* 6/28/04 Letter From Kearns to Wahle, AR at A0128-A0129.

[90] *See id.*, AR at A0129.

[91] *See* 6/29/04 Letter From Kearns to Wahle, AR at A0151-A0152.

[92] *See id.*, AR at A0152.

### 9.   Employee Interviews[93]

On July 7, 2004, defendants' attorney interviewed Good, Siegel and Maria Perez-Brau, Vice President of Cendant's Human Resources Department, on behalf of the Committee.[94]  During his interview, Siegel conceded that before February 17, 2004, Anderson's job was as he described it in his Declaration, although he misstated his authority in certain areas.[95]  In particular, Anderson did not have complete authority in setting contract terms with affiliates as Siegel was often involved in the negotiations and had final approval.[96]  Nor did Anderson have complete authority over which properties to list as Siegel had final approval over Anderson's decisions and would occasionally veto a listing.[97]  Siegel

---

[93]   The following notes were not produced to Anderson until May 17, 2005, as a result of a court order compelling production.  Anderson first requested these notes on July 20, 2004.  *See* AR at A0173 ("Mr. Anderson requests any notes, transcripts, summaries or other records describing or relating to the plan administrator's interviews with Michael Good and Stuart Siegel, who have personal knowledge relevant to his claim, and with Ms. Perez-Brau, with whom Mr. Anderson has never discussed his position at Cendant.").

[94]   *See* Interview Notes, Ex. B to the Judish Decl., at TBA02045-TBA02072. The first portion of Exhibit B (TBA02045-TBA02065) consists of Wahle's hand-written notes of the interviews, while the latter portion (TBA02066-TBA02072) consists of her typewritten notes.

[95]   *See id.* at TBA02066.

[96]   *See id.* at TBA02068.

[97]   *See id.*

provided the following additional information concerning Anderson's job

responsibilities with regard to affiliate management:

> (1) Anderson did not spend much of his time doing what he would call "affiliate management." The no. of affiliates was small (23) and they had long contracts.

> (2) Anderson focused his attention on certain affiliates that he thought were the most profitable for the region. He spent less time on other affiliates in his region that he did not think had profit potential. He was not interested in developing the potential of these underperforming units.

> (3) For the affiliates which he believed had higher profit potential, and on which he did focus his attention, his involvement with the affiliate was mostly on a property-specific basis. In other words, he would become involved in the marketing of specific properties – what the listing price should be, what kind of ad to purchase, how to market THIS property.

> (4) He generally would spend less time with affiliates on global development efforts, such as strategic planning in the marketplace, training, selection of sales agents, involvement in the community, etc. This was properly part of affiliate management, but according to Stuart, Anderson chose to focus his involvement on property-specific advice.

> (5) Anderson generally did not review financial performance of his affiliates or become involved in targets or goals. Although this was also properly part of affiliate management, Stuart said that Anderson chose not to become involved with

> strategic planning or performance reporting, and
> Stuart himself usually performed that role for
> Anderson's affiliates, bringing issues to Anderson's
> attention as appropriate.[98]

Siegel further explained that listing management involved obtaining listings for

the Sotheby's brand which included meeting with prospective sellers, marketing

the Sotheby's names, and selling Sotheby's services to the seller.[99] According to

Siegel, Anderson did a large amount of listing management.[100] However, the bulk

of Anderson's work was realtor services – traditional selling efforts that included

finding buyers, showing properties, negotiating terms, and making deals.[101]

On July 6, 2004, defendants' attorney interviewed Good and Perez-

Brau.[102] Wahle's typed notes of these interviews contain the following statement:

"Anderson's statements that Mike Good was not able to define a role for him

initially, were probably accurate. Mike had little time to prepare for the

transaction and he did not have a clearly defined role for the regional managers as

---

[98] *Id.* at TBA02067.

[99] *See id.* at TBA02068.

[100] *See id.*

[101] *See id.*

[102] *See id.* at TBA02070-TBA02072.

of 2/17."[103]  The notes then describe Cendant's traditional franchise model as a network with many "unique features" and a totally different compensation scheme.[104]  According to the notes, "[t]he sequence of events as described by Anderson are generally accurate as far as when the meetings took place, and the specific proposals. . . . [Anderson]  was told numerous times that the company wanted him, that his compensation would be comparable, that Good would work with him to define his role . . . ."[105]

Good denied that he ever told Anderson that his compensation would not be comparable.[106]  But Good did admit that he told Anderson that the method for calculating his compensation would change because franchise managers could not be compensated based on a percentage of profits.[107]  Good then stated that "Anderson was not asked to bring in new [franchises].  He was asked to convert existing affiliates."[108]  According to Good, Anderson would continue with

---

[103]  *Id.* at TBA02070.

[104]  *Id.*

[105]  *Id.* at TBA02071

[106]  *See id.*

[107]  *See id.*

[108]  *Id.* ("Good never intended for the regional managers to do sales to new franchises.).

franchise management on an ongoing basis and while he would no longer be entitled to a percentage of profits, he could have made himself available to assist in "listing presentations."[109] "Anderson would be available to consult on how to market specific properties just like he does now, he could also have done training, sales associate development, strategic marketing issues, etc."[110] Moreover, Anderson "could have continued to do all the realtor services he wanted. He could still refer buyers, he could still give advice about how to show properties to particular buyers. He could still show houses to wealthy individuals."[111]

## C. The Committee's Denials

### 1. The July 16, 2004 Denial

In a letter dated July 16, 2004[112] the Committee stated that in denying Anderson severance benefits it relied on the following: Anderson's letters dated March 17, 2004, May 10, 2004, June 28, 2004, and June 29, 2004; Cendant's letters dated March 29, 2004, May 28, 2004, and June 9, 2004; Anderson's Declaration; the Plan Document and the Summary Plan Description; and

---

[109] *Id.* at TBA02072.

[110] *Id.*

[111] *Id.*

[112] *See* 7/16/04 Denial Letter ("Initial Denial Letter"), AR at A0159-A0169.

interviews of Good, Siegel and Perez-Brau.[113]  The letter then summarizes the

relevant Plan provisions and the corresponding provisions in the Summary Plan

Description.[114]

According to the Committee, a position had been proposed to

Anderson with defined authority, responsibilities and compensation by the time he

resigned on March 31, 2004.[115]  However, the Committee conceded that "Cendant

believed that the discussion of Mr. Anderson's future role was an ongoing and

continuing one and that it was still evolving as of March 31. . . ."[116]  With regard

to responsibilities and authority, the Committee commented:

> We also were told by Michael Good that Mr. Anderson was
> asked *only* to work on converting the 23 affiliates in his
> current network, with which he was familiar.  He was not
> asked to (and would not be asked to) become a "franchise
> salesman" in the sense that he would be responsible for
> recruiting new brokerages into the franchise network; such
> responsibilities are handled by a specialized group within
> Cendant called the "Membership Sales Team."    Mr.
> Anderson's responsibilities for franchise conversion would
> extend only to his 23 current affiliates.[117]

---

[113] *See id.*, AR at A0159.

[114] *See id.*, AR at A0160-A0162.

[115] *See id.*, AR at A0162.

[116] *Id.*

[117] *Id.*, AR at A0162 (emphasis in original).

29

Furthermore, the Committee was told by Good and Perez-Brau that Anderson was asked to take on a very defined role with respect to the converted franchises.

> Specifically, he was asked to continue managing the relationship with these franchises and to continue to provide the same type of listing and realtor services that he had provided these affiliates prior to February 17. He would continue to provide the type of listing and realtor services that he lists in his Declaration (¶ 5) [118] to the converted franchisees, including assisting in listing presentations, referring qualified buyers, and presenting listings to buyers and negotiating sales when appropriate. Mr. Good and Ms. Brau informed us that Mr. Anderson would continue to assist his franchisees in establishing exclusive luxury listings and sales programs, and in providing ongoing specialized luxury services to the affiliates. We find these responsibilities comparable – in many ways identical – to Mr. Anderson's responsibilities in managing and assisting the affiliates in his region prior to February 17, 2004.[119]

---

[118] Paragraph five of the Anderson Declaration lists the following activities Anderson engaged in to carry out his overall responsibility for client relationships: (1) assisting brokers in creating an SIR program within the broker's territory; (2) assisting affiliates with SIR listing presentations; (3) working with affiliate agents to build their interest in the SIR program; (4) meeting with prospective sellers to encourage them to select an SIR affiliate; (5) selling SIR's additional marketing fee value to sellers; (6) accompanying affiliate agents on meetings with sellers; (7) presenting "listing presentations" for important properties; (8) qualifying prospective buyers for inspections of SIR high-end listings; (9) facilitating high-end sales; (10) speaking with co-operating agents to encourage offers for SIR listings; (11) presenting offers on SIR listings to sellers; (12) accompanying buyers to inspect SIR listings; and (13) directly negotiating sales of SIR listings. *See* Anderson Decl., AR at A0046.

[119] Initial Denial Letter, AR at A0163.

The Committee also believed that Anderson could continue selling exclusive luxury residential real estate "in connection with a small percentage of his franchisees' listings under the franchise model."[120]  Providing such services would help Anderson manage and grow his region and would "'fulfill[] his passion'" for such activities.[121]  In addition, Anderson would remain responsible for all of the activities described in paragraph five of his Declaration, whether directed toward an affiliate or a franchise.[122]  "Anderson would also remain involved in setting financial goals for the affiliates/franchisees under his management, as he is now."[123]  The Committee concluded that "Anderson's responsibilities and authority in the position offered to him by Cendant were comparable to those of his prior position."[124]

The Committee conceded that the "compensation model proposed to Mr. Anderson is obviously different than that which was in place prior to February 17, 2004."[125]  The Committee then totaled  Anderson's guaranteed income over the

---

[120] *Id.*, AR at 0164.

[121] *Id.* (quoting Anderson Declaration ¶ 9) (alteration in original).

[122] *See id.*, AR at A0164-A0165.

[123] *Id.*, AR at A0165.

[124] *Id.*

[125] *Id.*, AR at A0165.

next two years, 2004 and 2005, under the Cendant Compensation Proposal, which amounts to $1,750,000 [(Base Salary of $300,000 x 2) + Bonus of $150,000 x 2) + LTIP of $50,000 + Retention Bonus of $800,000]. The Committee noted that this amount exceeds Anderson's actual income over the past two years.[126] The Committee further noted that an additional $625,000 in discretionary and contingent bonuses (the Sales Incentive Bonuses plus the Discretionary Bonus) would have been payable to Anderson through December 31, 2005.[127] The Committee thus found "that the amount of guaranteed compensation at Cendant over the next two years exceeds the *total* amount of compensation that could reasonably have been expected to flow to Mr. Anderson had the February 17th sale not occurred."[128] Elaborating on the incentive provided under the Cendant model, the Committee stated that

> although the Cendant model did not compensate Mr. Anderson as a percentage of his region's profits, it nonetheless provides as much encouragement to Mr.

---

[126] *See id.*, AR at A0165-A0166. The Committee believes "that the proper comparison is to look at the amount of compensation, including the amount of guaranteed compensation, in both the old and new positions." AR at A0167.

[127] *See id.*, AR at A0166. The Committee conceded, however, that "[s]pecific criteria for some of these payments were not precisely defined at the time Mr. Anderson resigned on March 31, 2004, and further discussion was required to finalize these parameters."

[128] *Id.*, AR at A0167 (emphasis in original).

Anderson to assist in providing luxury sales services to affiliates/franchisees as did the old model. In fact, under the old model, the region earned a profit for every sale made by an affiliate of a Sotheby's-listed property, including those sales in which Mr. Anderson was not involved or only tangentially involved. The success of the franchisees within Mr. Anderson's regions will be just as dependent on and influenced by his personal involvement and advice concerning listings and sales as was the success of the affiliates under the old model. Although Mr. Anderson's compensation is not *as directly* derived from the financial performance of his affiliates and franchisees as it was under the old model, we do not believe this renders the compensation not "comparable."[129]

In sum, according to the Committee, "Anderson had no change in his job responsibilities prior to his resignation on March 31, 2004, and was offered an ongoing job position by Cendant that was of comparable responsibilities and compensation to that which he performed for SIR prior to the February 17, 2004 sale of SIR to Cendant."[130] Notwithstanding its position that a comparable job existed, the Committee conceded that Cendant representatives

were willing and eager to discuss improved terms to address Mr. Anderson's concerns. Although we do not speculate as to what Cendant may ultimately have offered Mr. Anderson as a final job position had he not resigned so that further discussions could have taken place, and are basing our decision on the position as offered, we believe that the position would have and could have been

---

[129] *Id.*, AR at A0168 (emphasis in original).

[130] *Id.*, AR at A0169.

substantially modified by Cendant to meet many if not all of Mr. Anderson's concerns.[131]

## 2.    Request for Reconsideration

In a letter dated July 20, 2004 Anderson asked the Committee to reconsider its initial denial of his claim for severance benefits.[132] He points out that the Committee did not "identify anyone at Cendant who offered Mr. Anderson a so-called 'defined' position, the date such an offer was made, or any documents that corroborate it."[133] Anderson faults the Committee for having failed to consider that Cendant did not disagree with him, prior to his termination on March 31, 2004, that it had failed to provide him a comparable position.[134] According to Anderson, the only defined duty identified by the Committee was the conversion of existing affiliates into franchises.[135] But Anderson had no responsibility for converting franchises while at SIR, which employed an affiliate model rather than

---

[131] *Id.*, AR at A0164.

[132] *See* 7/20/04 Letter From Kearns to Alexander, AR at A0170-A0174. Anderson asks that the Committee closely revisit the basis, rationale and motivation for its denial. *See* AR at A0173.

[133] *Id.*, AR at A0170.

[134] *See id.* ("Cendant's own letter dated March 29, 2004, . . . admits no defined position has been offered as of that date.").

[135] *See id.*, AR at A0171.

34

the entirely different franchise model employed by Cendant.[136]  Thus, in

Anderson's view, the Committee's statement that he had been offered a specific,

comparable position with defined authority, responsibilities and compensation is

simply not credible given its characterization of his position as "evolving."[137]

Anderson also criticizes Cendant's proposed compensation package

as discretionary and not driven by his personal performance or any other factor

within his control.[138]  Under the Cendant Compensation Proposal, Anderson

purportedly had "no financial incentive to assist in providing luxury sales services

to franchises or to engage personally in luxury sales."[139]  Anderson explains that

the Committee's reference to his "passion" as a source of incentive to engage in

luxury sales is evidence of a major distinction between his compensation at SIR

and his compensation at Cendant.[140]  Anderson further discounts the Committee's

reliance on the $800,000 retention bonus, noting that he would have earned far

below his SIR compensation if he did not remain at Cendant through December

---

[136] *See id.*

[137] *See id.*, AR at A0170.

[138] *See id.*, AR at A0172.

[139] *Id.* Anderson claims that the Committee admitted this fact in its denial letter.

[140] *See id.*

31, 2005.[141]

Finally, Anderson distinguishes an existing, specific job position from a conceptual, work-in-progress position subject to further negotiation.[142]

> The [C]ommittee's ultimate determination rests primarily on its stated belief that Cendant was "eager to address improved terms" with Mr. Anderson and was willing to negotiate in "good faith." Nothing in the Plan, however, permits denial of a participant's benefits based on a new employer's alleged good will. Rather, an assessment of benefits entitlement requires the [C]ommittee to compare the responsibilities, compensation and other relevant considerations relating to the position Mr. Anderson actually held at Cendant to those of the position he held at SIR. This the [C]ommittee has entirely failed to do.[143]

### 3. September 16, 2004 Letter

Anderson raises two points in the September 16, 2004 letter from his attorney to defendants' attorney. First, Anderson denies that there were ongoing negotiations and that he had been told that his compensation and responsibilities would be unchanged pending those negotiations.[144] Second, Anderson disputes Cendant's allegation that it could not provide a written offer of employment

---

[141] *See id.*, AR at A0171-A0172.

[142] *See id.*, AR at 0173.

[143] *Id.*

[144] *See* 9/16/04 Letter From Kearns to Wahle, AR at A0197-A0198.

because Anderson quit with only two days notice.[145] Cendant knew as early as

March 17, 2004, that Anderson planned to leave by March 31, 2004, and that he

believed that Cendant had not offered him a comparable position.[146]

Finally, Anderson asserts that the Committee did not consider the conflict of

interest arising out of the dispute between Cendant and Sotheby's as to which of

them had the obligation to pay Anderson's severance.[147] Because of this conflict

of interest, Anderson believes that "the credibility of Cendant's apparently

unsupported assertions is severely compromised."[148] In sum, Anderson argues that

"there is simply no legal authority or documentary support in [the] record for many

of the substantive and material conclusions in the plan administrator's July 16,

2004 letter."[149]

### 4. The September 20, 2004 Appeal Denial

In a letter dated September 20, 2004 the Committee denied

Anderson's appeal of its initial decision denying him severance benefits.[150]

---

[145] *See id.*, AR at A0197.

[146] *See id.*

[147] *See id.*, AR at A0198.

[148] *Id.*

[149] *Id.*

[150] *See* 9/20/04 Appeal Denial Letter ("Appeal Denial"), AR at A0199-A0217.

37

Significant portions of the Appeal Denial were taken, verbatim, from the Initial Denial Letter.[151]  In addition to the evidence relied on in the July 16, 2004 denial letter and the letter itself, the Appeal Denial also relied on Anderson's July 20, 2004 letter requesting reconsideration, his September 16, 2004 Letter, and Forms W-2 issued for the period 1999-2003.[152]  Furthermore, representatives of Cendant, including Good, Siegel and Perez-Brau, were asked to review the Committee's July 16th denial letter for accuracy and comment on Anderson's July 20th reconsideration letter.[153]

The Appeal Denial first summarizes the points raised by Anderson in his July 20, 2004 and September 16, 2004 letters.[154]  As with the July 16th denial letter, the Committee found, based on a review of the evidence, "that a position was offered to Mr. Anderson by Cendant before Mr. Anderson's resignation on March 31, with specific and defined authority, responsibility and compensation, *and that this offer was communicated to him by Michael Good*."[155]  The

---

[151] *Compare* Initial Denial Letter ("Review of Mr. Anderson's Offer From and Future Role With Cendant," "Responsibilities and Authority," and "Compensation and Benefits) *with* Appeal Denial (same).

[152] *See* Appeal Denial, AR at A0199.

[153] *See id.*, AR at A0200.

[154] *See id.*, AR at A0200-A0202.

[155] *Id.*, AR at A0204 (emphasis added).

38

Committee emphasized that it was not basing its comparability analysis on any

speculative position, but rather the specific, defined position offered to Anderson

prior to March 31, 2004.[156] This specific, defined position included converting

existing affiliates into franchises and ongoing affiliate management and

administration.[157] As evidence that a specific position was offered to Anderson,

the Committee cited the Compensation Proposal.[158] "The detail inherent in

Cendant's compensation offer . . . – which *was* made in writing to Mr. Anderson –

also confirms that the duties and responsibilities of the position offered to Mr.

Anderson had been thought out and defined."[159]

---

[156] *See id.*, AR at A0205. "The committee's determination that the job responsibilities of the position offered to him by Cendant were comparable to those prior to the February 17 sale does not, in any sense, rest 'primarily' (or in any other fashion) on its 'stated belief' that Cendant would have continued to negotiate an improved position . . . but rather is solely based on the specific position offered as of March 31, 2004." AR at A0206.

[157] *See id.* Good and Perez-Brau told the Committee that Anderson was asked to take on a very defined role with respect to converted franchises. "Specifically, he was asked to continue managing the relationship with these franchisees and to continue to provide the same type of listing and realtor services that he had provided these affiliates prior to February 17." AR at A0208.

[158] "Michael Good's statements that he expressly offered to Mr. Anderson a specific, defined position with specific and defined responsibilities, authorities and duties, and Ms. Perez-Brau's statements that she worked with Mr. Good in defining this position, are entirely consistent with both the compensation model presented on March 16 and with common sense." AR at A0206.

[159] *Id.*, AR at A0205 (emphasis in original).

Once again, the Committee stated that Anderson's responsibilities for franchise conversion would only extend to his twenty-three current affiliates.[160] Good informed the Committee that there was never any intention that Anderson engage in franchise sales, which were to be handled by Cendant's Membership Sales Team.[161] With regard to Anderson's projected responsibilities in converting affiliates into franchisees, the Committee found

> that these responsibilities are comparable to the responsibilities that Mr. Anderson performed in negotiating these affiliates' contracts prior to February 17. Mr. Anderson would be required to persuade these affiliates as to the value of the Sotheby's brand, the benefit to continuing the Sotheby's relationship, the value of the services that would be provided to the affiliate under the Sotheby's franchise banner, and he would have negotiated the terms of these franchise contracts. This would have required Mr. Anderson to continue and build on his relationships with his region's affiliates, to use his knowledge of Sotheby's services and the value of the Sotheby's label in each market, to understand the real estate market in the affiliate's geographical area, to understand the affiliate's placement in the market, and to advise the affiliate as to its potential for increasing or expanding market share in its region using the Sotheby's brand. Contrary to [Anderson's] assertion in [the] July 20 letter that these were entirely new responsibilities which Mr. Anderson did not have prior to February 17, 2004, we find these duties and responsibilities comparable to Mr. Anderson's responsibilities in establishing and managing

---

[160] *See id.*, AR at A0206.

[161] *See id.*. AR at A0207.

40

the affiliates in his region prior to the February 17 sale.[162]

The Committee disagreed that Anderson's "'primary professional goal' at Cendant would be 'franchise conversion'" as Good and Perez-Brau informed the Committee that Anderson "would continue to assist his franchisees in establishing exclusive luxury listings and sales programs, and [would continue] . . . providing ongoing specialized luxury services to the affiliates."[163]

The Committee could not understand why Anderson felt he could no longer provide personal realtor services under the Cendant model.[164] The Committee reasoned: "Although the total listings in his region's inventories would grow, there is no reason why Mr. Anderson could not select specific properties with which to become personally involved, wither in performing listing services or realtor services for the buyer. . . . Mr. Anderson could have and would have continued to provide the same type of services in connection with a small percentage of his franchisee's listings under the franchise model."[165] The Committee's understanding in this regard was confirmed by Good.[166] Moreover,

---

[162] *Id.*, AR at A0207-A0208.

[163] *Id.*, AR at A0208 (quoting July 20, 2004 Letter at 4).

[164] *See id.*, AR at A0209.

[165] *Id.*

[166] *See id.*

41

the Committee denied Anderson's allegation that the Committee admitted that Anderson had no financial incentive to provide luxury sales services under the Cendant model.[167]

The Committee conceded that the "compensation model proposed to Mr. Anderson is obviously different than that which was in place prior to February 17, 2004."[168] The Committee also admitted that Good told Anderson that compensation based on the old SIR model was no longer possible.[169] However, Good denied ever having told Anderson that earning $800,000 per year "'will no longer be possible.'"[170] As in the Initial Denial Letter, the Committee stated its belief that the proper focus for comparison is on the total amount of compensation, particularly the guaranteed portions of that compensation.[171] Once again, the Committee found that the amount of guaranteed income under the Cendant Compensation Proposal exceeds the amount of guaranteed compensation

---

[167] *See id.*, AR at A0214 ("Although the Cendant model did not compensate Mr. Anderson as a percentage of his region's profits, it nonetheless provides as much encouragement to Mr. Anderson to assist in providing luxury sales services to affiliates/franchisees as did the old model.).

[168] *Id.*, AR at A0210.

[169] *See id.*, AR at A0212.

[170] *Id.*

[171] *See id.*, AR at A0213.

Anderson received while at SIR.[172] As for Anderson's assertion that the compensation he received from Cendant during the period February 18, 2004 through March 31, 2004 consisted only of his $150,000 base salary and did not include his customary 36.3% bonus, the Committee found that the SIR bonus component "was payable only at the end of the year and was conditional on Mr. Anderson remaining employed until the end of the year."[173]

As for the conflict of interest and credibility issues raised in Anderson's September 16, 2004 letter, the Committee alleged that it determined Anderson's claim based on the terms of the Plan and the evidence before it, without considering which entity may ultimately be responsible for the payment of benefits.[174] Furthermore, the Committee found no reason to question the credibility of the statements made by Cendant employees including Good, Siegel and Perez-Brau.[175] The facts learned in the interviews were deemed credible by the Committee because, in part, the "interviews were lengthy, and the interviewees appeared unguarded, comfortable, and answered all questions posed to them."[176]

---

[172] *See id.*

[173] *Id.*, AR at A0215.

[174] *See id.*, AR at A0216.

[175] *See id.*

[176] *Id.*

The Appeal Denial concludes that Anderson "had no change in his job responsibilities prior to his resignation on March 31, 2004, and was offered an ongoing position by Cendant that was of comparable responsibilities and compensation to that which he performed for SIR prior to the February 17, 2004 sale of SIR to Cendant."[177] The Committee thereby upheld its initial denial of Anderson's claim for severance benefits.[178]

## III.  LEGAL STANDARD

"Where the decision to grant or deny [ERISA] benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply."[179] Instead, a district court must review a plan administrator's decision denying benefits and, in so doing, may rely only on the evidence contained in the administrative record.[180] "Where review is properly confined to the administrative record before the ERISA plan administrator, . . . there are no disputed issues of

---

[177] *Id.*

[178] *See id.*

[179] *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

[180] *See Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995).

44

fact for the court to resolve."[181] Because judicial review is limited to the

administrative record, "the district court sits in effect as an appellate court to

determine whether the denial of ERISA benefits was arbitrary and capricious."[182]

Where an ERISA-covered plan grants the plan administrator with

discretionary authority to determine eligibility for benefits, a court must review the

administrator's decision under the arbitrary and capricious standard.[183] "Under

this highly deferential standard of review, this Court cannot substitute its own

judgment for that of the Plan Administrator and will not overturn a decision to

deny or terminate benefits unless it was 'without reason, unsupported by

substantial evidence or erroneous as a matter of law.'"[184] Accordingly, an

administrator's decision cannot be disturbed if it is consistent with the terms of the

---

[181] *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 518 (1st Cir.), *cert. denied*, 126 S. Ct. 425 (2005).

[182] *Rizk v. Long Term Disability Plan of the Dun & Bradstreet Corp.*, 862 F. Supp. 783, 791 (E.D.N.Y. 1994). *See also Miller*, 72 F.3d at 1071 ("[N]othing 'in the legislative history suggests that Congress intended that federal courts would function as substitute plan administrators . . . .'") (quoting *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir. 1990)).

[183] *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). This Court has previously held that the arbitrary and capricious standard is the governing standard in this case. *See Anderson*, 2005 WL 2583715, at *5.

[184] *Fuller v. J.P. Morgan Chase & Co.*, 423 F.3d 104, 107 (2d Cir. 2005) (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995) (quoting *Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993))).

45

plan, "based on a consideration of the relevant factors," and supported by

"substantial evidence."[185] [186] As explained by the Seventh Circuit, the arbitrary and

capricious standard

> gives great deference to the decision of a committee which
> cannot be overturned unless the committee's decision was
> a downright unreasonable one. It is not the function of the
> district court to decide whether it would have reached the
> same conclusion as the committee or to substitute its
> judgment for the judgment of the committee. But even
> review under this most deferential standard does not
> amount to a rubber stamp. The committee must articulate
> a rational connection between the facts found, the issue to
> be decided, and the choice made. Where the committee's
> interpretation of the plan defies all common sense, the
> district court must overturn that decision.[187]

There is, however, an added wrinkle where the plan administrator is

operating under an inherent conflict of interest.[188] In general, a conflicted

---

[185] *Miller*, 72 F.3d at 1072. *See also Abnathya*, 2 F.3d at 48 (stating that under this highly deferential standard, "the court must defer to the administrator unless it is clear that the decision is not supported by the evidence in the record or that the administrator has failed to comply with the procedures required by the plan").

[186] Substantial evidence "'is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker] . . . requires more than a scintilla but less than a preponderance.'" *Miller*, 72 F.3d at 1072 (alterations in original) (quoting *Sandoval v. Aetna Life & Casualty Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992)).

[187] *Dabertin*, 373 F.3d at 828 (citations omitted).

[188] For example, an inherent conflict of interest arises where, as here, "the Plan is unfunded and the members of the Committee serving as the Administrator are

administrator is given the same level of deference as a non-conflicted

administrator unless the plaintiff can show that "the administrator was *in fact*

influenced by the conflict of interest."[189]  If plaintiff cannot make this showing, the

fact that the administrator both determines eligibility and pays benefits serves only

as "a factor to be weighed in determining whether there has been an abuse of

discretion."[190]  I have previously found that Anderson demonstrated the likelihood

of an actual conflict of interest.[191]  However, I also found that plaintiff failed to

demonstrate that the Administrator's decision was in fact influenced by this

conflict of interest.[192]  Therefore, the conflict of interest will only be considered as

a relevant factor in considering the propriety of the Administrator's decision.[193]

---

all employees of the sponsoring Company." *Anderson*, 2005 WL 2583715, at *3.

[189] *Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 92 (2d Cir. 2000) (emphasis in original, quotations and citation omitted).

[190] *Id.* (quotations and citation omitted).

[191] *See supra* note 188.

[192] *See Anderson*, 2005 WL 2583715, at *4.

[193] *See Zuckerbrod v. Phoenix Mut. Life Ins. Co.*, 78 F.3d 46, 49 (2d Cir. 1996) ("In applying the arbitrary and capricious standard, however, a court must weigh as a relevant factor whether an insurer operates under an inherent conflict of interest, by both administering a plan and paying benefits out of its own funds.").

## IV. DISCUSSION

### A. The Committee's Decision Is Not Supported by Substantial Evidence

#### 1. Responsibilities

In exercising its discretion, an administrator may weigh competing evidence but it may not "cherry-pick" the evidence it prefers while ignoring significant evidence to the contrary.[194] But that is precisely what happened in this case. In finding that Cendant offered Anderson a comparable position, the Committee relied heavily on certain excerpts from the self-serving interviews of Good, Siegel and Perez-Brau, to the exclusion of contrary evidence. For example, the Committee gave considerable weight to Good's statement that Anderson would have franchise management responsibilities that were comparable to his prior affiliate management responsibilities. However, the Committee ignored Siegel's statement that Anderson had not previously spent much time on affiliate management. The Committee also ignored Siegel's statement that the bulk of Anderson's work at SIR involved traditional selling efforts such as finding and referring buyers, showing properties, negotiating terms, and making deals. It was

---

[194] *See Offenberg v. UNUM Life Ins. Co. of Am.*, 986 F. Supp. 351, 354 n.3 (S.D. W. Va. 1997) ("[I]f the Court could not exercise its remand power in a situation such as this plan administrators could pick and choose the evidence they might rely upon, ignore other relevant evidence, and essentially 'build' a record that would withstand abuse of discretion review.").

therefore misleading for the Committee to find the Cendant position comparable based on a comparison of franchise management to affiliate management, knowing that only a small portion of Anderson's time was previously spent on affiliate management.

The Committee also ignored portions of the interviews that did not support its decision. For example, in his interview, Good confirmed that he was not initially able to define a role for Anderson. Good also admitted that the sequence of events as described by Anderson was generally accurate as to when meetings between him and Anderson took place and the specific proposals made at those meetings. Good thereby corroborated many of the assertions in the Anderson Declaration. For example, at a meeting held on February 19, 2004, Anderson alleges that he was told he would begin selling franchises to existing SIR affiliates and then develop additional broker franchises in new markets. Moreover, Anderson claims that he was not told that he would continue servicing affiliates after converting them into franchises. However, the Initial Denial Letter and the Appeal Denial state that the Committee was informed by Good that Anderson would continue: (1) assisting franchisees in establishing exclusive luxury listings and sales programs; and (2) providing specialized luxury services to the franchisees. There is no mention, however, of "luxury listings" or "luxury

services" in Good's interview notes.

Nor is there substantial evidence in the record to support the Committee's finding that, by the time of his resignation, Anderson had been offered a specific position with defined authority and responsibilities. Although the Committee claims it was told by Good that Anderson was asked to take on a very defined role with respect to converted franchisees, there is nothing in Good's interview notes that indicate that Cendant made any offer at all to Anderson. Although Good describes the various functions that Anderson would remain responsible for while at Cendant, he never states that Anderson was ever told what his new responsibilities would be. In fact, the only evidence of an offer is in Cendant's March 29th and June 9th letters.[195] But those letters do not provide any details of an "equivalent position" with "comparable duties." Furthermore, in the March 29th letter Cendant states that NRT would maintain the status quo while it "continue[d] to negotiate appropriate modifications to Mr. Anderson's position and compensation."[196] This strongly suggests that a position with defined

---

[195] The June 9th letter states: "Mr. Anderson was provided a verbal offer of employment with terms and conditions comparable to his position prior to Cendant's acquisition . . . ." AR at A0121.

[196] AR at A0034 ("[F]or the time being, NRT is willing to maintain Mr. Anderson's previous role and compensation package in all material respects so that the parties can negotiate a satisfactory arrangement.").

responsibilities had not yet been established, much less conveyed to Anderson, two days before his resignation.

The Committee cites the Cendant Compensation Proposal as further proof that the duties and responsibilities of the position offered to Anderson had been thought out and well-defined.[197] If that is the case, the Cendant Compensation Proposal highlights the disproportionate ratio between franchise conversion and realtor services provided to affiliates/franchisees. For example, comparing the 2004 Discretionary Bonus of $100,000 to the combined 2004 Sales Incentive Bonuses of $210,000 yields a ratio of approximately one to two. From this ratio, it appears that in Cendant's best expectations, Anderson would spend twice the amount of time on franchise conversion than he would at traditional realtor services. This is a marked difference from the past when Anderson spent the majority of his time at realtor services. In addition, the Discretionary Bonus terminates after 2005. Presumably, Cendant did not expect Anderson to have any role in selling real estate once all of the affiliates converted in 2005. The Committee did not address the cessation of the Discretionary Bonus in either the Initial Denial Letter or the Appeal Denial. Finally, unlike the SIR percentage-

---

[197] *See* AR at A0205 ("The detail inherent in Cendant's compensation offer . . . – which *was* made in writing to Mr. Anderson – also confirms that the duties and responsibilities of the position offered to Mr. Anderson had been thought out and defined.") (emphasis in original).

based incentive bonus, nothing in the Compensation Proposal directly ties any portion of Anderson's compensation to his personal efforts at providing traditional realtor services.[198] For all of these reasons, the Committee's conclusion that Anderson was offered a comparable position is not supported by substantial evidence.

Even assuming, *arguendo*, that Anderson would have continued selling luxury real estate while at Cendant, the imposition of a new responsibility, namely, franchise conversion,[199] significantly distinguishes Anderson's Cendant position from his previous position at SIR. This factor alone precludes a finding of comparability. Common sense dictates that adding a new responsibility necessarily detracts from the amount of time that can be spent on previous responsibilities. This conclusion is supported by case law. In *Dabertin*, there was

---

[198] *See* Anderson Declaration, AR at A0049 ("The percentage-based incentive bonus component of [Anderson's] compensation was the result of [Anderson's] specific request to SIR in 1995 that [his] bonus program be based on the traditional industry percentage-based commission model applicable to most real estate brokerage agents. It was important to [Anderson] that the bulk of [his] compensation be calculated in this manner to reward [his] efforts at listing and selling luxury residences and to recognize that the success of the affiliates and brokers in [his] regions was linked to [his] personal efforts at selling SIR's luxury listings.").

[199] Both the Initial Denial Letter and the Appeal Denial concede that Anderson would be responsible for franchise conversion for his twenty-three current affiliates.

a merger followed by a plan to radically alter the operations of the merged entity (the "Company").[200] The plaintiff, who had worked for the predecessor company for over seventeen years, was forced to take on the role of general manager.[201]

> As general managers, [the Company] expected the executives to spend significantly more time in the facilities assigned to them and participate more directly in their day-to-day management. All of the vice presidents, including Dabertin, were required to perform all of the same functions they performed when they were solely vice presidents, but to those duties [the Company] added new ones – those of a general manager. To accommodate the time-consuming nature of these increased hands-on duties, [the Company] opted to reduce the number of facilities to which some vice presidents were assigned.[202]

The plaintiff had "formerly directed operations of all of the facilities in the Central and Western Divisions of the [predecessor company]."[203] As a result of the merger, the plaintiff was assigned only to the Western Division.[204]

---

[200] *See Dabertin*, 373 F.3d at 824.

[201] *See id.*

[202] *Id.* at 824-25.

[203] *Id.* at 825.

[204] *See id.*

The Company's severance committee denied the plaintiff's request for severance benefits.[205] The committee "determined that in Dabertin's case, her duties, responsibilities, authority, title, position and functions had actually 'significantly increased' since she, as well as the other vice presidents, "were expected to spend significantly more time in the facilities in their divisions . . . ."[206] The court found the committee's decision denying benefits to be arbitrary and capricious, stating as follows:

> The Committee's interpretation of a decrease in the scope of duties defies common sense. If [the Company] had added to each vice president's duties a new set of duties – emptying bedpans, delivering meals, and mopping floors – under [the Company's] interpretation of the Plan, these new duties would not have decreased the "scope" of the vice president's role at all. In fact, the scope of the vice president's duties would have increased. After all, they have not lost their title (they are still vice presidents, they have just added to that title the additional title of "janitor"). Likewise, they have not lost any of their prior duties; they simply have added a few new tasks. Common sense dictates otherwise. When the defendants took the Central Division away from Dabertin, they eliminated her authority for the Central Division, and the additional general

[205] *See id.* at 826. Under the Company's plan, an employee terminated for "good reason" was entitled to severance benefits. The plan defined "good reason" as a "'significant reduction in the scope of a Participant's authority, position, title, functions, duties or responsibilities.'" *Id.* at 825.

[206] *Id. See also id.* at 829 ("The Committee determined that the scope of Dabertin's employment had not changed as she had the same list of duties before and after the merger; she just had fewer facilities in which to perform them.").

manager tasks in no way compensated Dabertin for the loss of authority.[207]

The court concluded that there was simply no "rational connection" between the plaintiff's loss of authority and the committee's finding that the Company did not reduce the scope of the plaintiff's job.[208] The Committee's decision denying the plaintiff severance benefits was therefore held to be arbitrary and capricious.[209]

In sum, there is no substantial evidence in the record supporting the Committee's conclusion that the responsibilities and authority offered to Anderson by Cendant were comparable to those he had at SIR. In reaching its conclusion, the Committee relied almost exclusively on Good's interview. While Good describes some comparable activities Anderson could have performed while at Cendant, he does not state that these activities were memorialized or otherwise conveyed to Anderson. In any event, the addition of the franchise conversion responsibility significantly differentiates the two positions. The Committee's decision finding them comparable with regard to authority and responsibilities was an arbitrary and capricious abuse of discretion and must be overturned.

---

[207] *Id.* at 829.

[208] *See id.* at 830.

[209] *See id.*

## 2. Compensation

In denying Anderson severance benefits, the Committee found that Cendant had offered Anderson comparable compensation.[210] In so finding, the Committee determined that the amount of guaranteed income Anderson would have earned at Cendant during 2004 and 2005 exceeded the total amount of income he would have earned at SIR for the same time period. The Committee's reasoning is flawed in several respects. *First*, the Committee considered only two years in its analysis. However, Anderson worked at SIR for over twenty years and there is no reason to presume that he would have worked for Cendant for only two years. Therefore, the Committee improperly ignored years 2006-2008, where the absolute amount of compensation is significantly less than Anderson's SIR compensation in recent years. *Second*, and conversely, the Committee assumed that Anderson would remain at Cendant through December 31, 2005, and thereby qualify for the Lump Sum Retention Bonus. If Anderson were to have resigned or been terminated before then,[211] his guaranteed compensation for 2004 and 2005

---

[210] The Committee made this finding despite acknowledging that "Anderson's compensation is not *as directly* derived from the financial performance of his affiliates and franchisees as it was under the old model . . . ." AR at A0168 (emphasis in original). This finding also directly contradicts Good's statement that the "[c]ompensation scheme is completely different." TBA 02070.

[211] If Anderson were terminated, he would not have qualified for the $800,000 severance payment because of his admitted refusal to sign a non-competition

would have been $450,000 and $500,000, respectively, which represents a drastic reduction from his average $815,000 per year at SIR.[212]  For these reasons, Cendant's proposed compensation is not comparable to the compensation Anderson received at SIR.[213]

### B.    The Committee Improperly Withheld Evidence That It Considered in Denying Anderson's Claim

Although the Committee relied heavily, if not exclusively, on the notes of interviews taken of Siegel, Good and Perez-Brau, it withheld such notes from Anderson until this Court ordered their production on May 17, 2005.  This represents a violation of both ERISA's full and fair review requirement[214] and the

---

agreement.

[212]  While the bonus amount at SIR differed each year, Anderson always received a substantial bonus in the mid-six figures.  *See supra* notes 42-44. Barring a recession or collapse of the real estate industry, it is reasonable to assume that this virtually guaranteed bonus would have continued.

[213]  *See Yochum v. Barnett Banks, Inc. Severance Pay Plan*, 234 F.3d 541, 546 (11th Cir. 2000) ("[B]ecause [plaintiff's] salary and benefits package would have decreased after one year, the new job did not provide 'equivalent compensation and benefits' as required.  Therefore, by turning down this offer, [plaintiff] did not decline an offer of 'comparable employment.'").

[214]  *See* 29 U.S.C. § 1133 ("[E]very employee benefit plan shall – (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and  (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the

Plan procedures.[215]

"The fiduciary's failure to provide a full and fair review can constitute a decision that was arbitrary and capricious."[216] "The purpose of [the full and fair review] requirement is to provide claimants with enough information to prepare adequately for further administrative review or an appeal to the federal courts."[217] At its core, the full and fair review requirement "include[s] knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of that evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision."[218] As explained in *Grossmuller,*

> To afford a plan participant whose claim has been denied
> a reasonable opportunity for full and fair review, the plan's
> fiduciary must consider any and all pertinent information

decision denying the claim.").

[215] The Summary Plan Description provides for review of the documents that relate to a claimant's claim.

[216] *Neely v. Pension Trust Fund of the Pension, Hospitalization and Benefit Plan of the Elec. Indus.*, No. 00 CV 2013, 2004 WL 2851792, at *8 (E.D.N.Y. Dec. 8, 2004).

[217] *Juliano v. The Health Maint. Org. of NJ, Inc.*, 221 F.3d 279, 287 (2d Cir. 2000) (quotations and citation omitted).

[218] *Grossmuller v. International Union, United Auto. Aerospace & Agric. Implement Workers of Am., U.A.W. Local 813*, 715 F.2d 853, 858 n.5 (3d Cir. 1983) (citing *Morgan v. United States*, 304 U.S. 1, 18-19 (1938)).

reasonably available to him. The decision must be supported by substantial evidence. The fiduciary must notify the participant promptly, in writing and in language likely to be understood by laymen, that the claim has been denied with the specific reasons therefor. *The fiduciary must also inform the participant of what evidence he relied upon and provide him with an opportunity to examine that evidence* and to submit written comments or rebuttal documentary evidence. If the fiduciary allows third parties to appear personally, the same privilege must be extended to the participant.[219]

Defendants claim that Anderson cannot show any prejudice resulting from the non-disclosure of the interview notes. "Because the initial denial letter provided Anderson with the exact substance of the statements on which the Committee relied, Anderson cannot now assert that he was unable to address or rebut these statements in his administrative appeal."[220] Defendants are wrong. The following statements made by Siegel do not appear in the Initial Denial Letter:

- Anderson's job prior to 2/17 was, for the most part, generally as he described it in his submission.

- Anderson did not spend much of his time doing what we would call "affiliate management." The no. of affiliates was small (23) and they had long contracts.

- His involvement with the affiliate was mostly on a property specific basis. In other words, he would become involved in the marketing of

---

[219] *Id.* at 857-58 (emphasis added).

[220] Memorandum in Support of Defendants' Motion For Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment at 14.

specific properties – what the listing price should be, what kind of ad to purchase, how to market THIS property.

- He generally would spend less time with affiliates on global development efforts, such as strategic planning in the marketplace, training, selection of sales agents, involvement in the community, etc.

- Anderson chose to focus his involvement on property specific advice.

- Anderson generally did not review financial performance of his affiliates or become involved in targets or goals.

- Anderson chose not to become involved with strategic planning or performance reporting.

- Anderson did a large amount of [listings management], and would have done the listing presentations (along with an affiliate) for many of the listings in his region's inventory. This is what Anderson was good at, and this was an important service offered affiliates.

- This means he would go to the home of the seller and sell Sotheby's services to the seller.

- [T]raditional selling efforts. Finding or referring buyers, showing properties, negotiating terms, making the deal. This was the bulk of Anderson's effort.

- His region's total inventory for the year would be smaller than [200 listings].

The following statements by Good are similarly not found in the Initial Denial

Letter:

- Anderson's statements that Mike Good was not able to define a role for him initially, were probably accurate. Mike had little time to prepare for the transaction and he did not have a clearly defined role for the regional mangers as of 2/17.

- [Cendant's] Company-owned franchise has 54% listings under 1 M.

- Franchises would sell all of their properties under the Sotheby's label.

- Compensation scheme is completely different.

- The 36%-of-profits as a compensation base would not work and could not be duplicated in a franchise system. . . . That is not how it is done; rather, income is traditionally based on growing the franchises.

- The sequence of events as described by Anderson are generally accurate as far as when the meetings took place, and the specific proposals.

Without the interview notes, Anderson was unable to "correct any errors in the record" or "point to any favorable evidence that would tend to support the claim."[221] "The opportunity to review . . . pertinent documents is critical to a full and fair review, for by that mechanism the claimant has access to the evidence upon which the decision-maker relied in denying the claim and thus the opportunity to challenge its accuracy and reliability."[222] Because Anderson was deprived of the very documents so heavily relied on by the Committee, he was denied a full and fair review of his claim. The Committee's egregious conduct in withholding such documents supports the conclusion that the Administrator's decision denying benefits was arbitrary and capricious and must be overturned.

---

[221] *DiGregorio v. Hartford Comprehensive Employee Benefit Serv. Co.*, 423 F.3d 6, 15 (1st Cir. 2005).

[222] *Id.* at 14-15.

### C. Anderson Is Not Entitled to a Bonus for Work Performed in 2004

In addition to severance, Anderson also seeks payment of a bonus allegedly earned at SIR from January 1, 2004 through February 17, 2004. Anderson invokes breach of contract and, alternatively, quantum meruit theories in support of this claim. Anderson claims that he "received an annual letter from SIR reaffirming this 36.3% formula" used in computing his bonus.[223] These letters were sent several months after year-end so that the actual pre-tax profit for Anderson's regions could be accurately calculated.[224] Anderson acknowledges this "longstanding agreement" in claiming that he has a contractual right to a bonus.[225] What plaintiff omits, however, is that each year his bonus would vest sometime after year-end so long as he remained employed at SIR. I find that Anderson's continuing employment at SIR at year-end was an implied condition precedent to receiving a bonus. Anderson failed to meet that condition in 2004, as he was terminated on February 17, 2004. Therefore, although Anderson may have had a contractual right to a bonus in 2004, he did not meet one of the terms of that contract. As a result, he is not entitled to a bonus for work performed at SIR in

---

[223] Plaintiff's Memorandum in Support of Motion For Summary Judgment at 22.

[224] *See supra* notes 42-44.

[225] *Id.*

2004.[226]

## V.   CONCLUSION

For the foregoing reasons, summary judgment is granted in favor of Anderson with regard to his claim for severance benefits.  The Plan Administrator is directed to calculate the amount of such benefits and pay them to Anderson forthwith.  Summary judgment is granted in defendants' favor with regard to Anderson's bonus claim.  The Clerk of the Court is directed to close this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           June 22, 2006

---

[226] As for Anderson's quantum meruit theory, "'where there is an express contract, no recovery can be had on a theory of implied contract.'" *Criscuolo v. Joseph E. Seagram & Sons, Inc.*, No. 02 Civ. 1302, 2003 WL 22415753, at *11 (S.D.N.Y. Oct. 21, 2003) (quoting *Hoenberg Co. v. Iwai New York, Inc.*, 180 N.Y.S.2d 410, 412 (1st Dep't 1958)).  Anderson's quantum meruit claim is therefore dismissed.

## - Appearances -

**For Plaintiff:**

Christine N. Kearns, Esq.
Julia E. Judish, Esq.
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, N.W.
Washington, D.C. 20037-1128
(202) 663-8000

**For Defendants:**

Karen M. Wahle, Esq.
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, D.C. 20006
(202) 383-5300

Jeffrey G. Huvelle, Esq.
David H. Remes, Esq.
Gus Sandstrom, Esq.
Covington & Burlington
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20044-2401
(202) 662-5526